[Civ. No. 68622. Second Dist., Div. Three. Sept. 27, 1984.]

DAVID PINES et al., Plaintiffs and Respondents, v.
W. R. TOMSON et al., Defendants and Appellants.

COUNSEL

David L. Llewellyn, Jr., for Defendants and Appellants.

Weisz & Weisz, Michael B. Weisz, Richard A. Weisz, Justin J. Finger, Jeffrey P. Sinensky and David A. Lehrer for Plaintiffs and Respondents.

Gilbert Gaynor and Fred Okrand as Amici Curiae.

OPINION

ARABIAN, J.—

## INTRODUCTION

Plaintiffs and respondents David Pines, George Aronek, doing business under the fictitious name of Grecian Art Tiles, and Anti-Defamation League of B'nai B'rith[1] (individually, Pines, Aronek, Grecian Art Tiles and the ADL, and collectively, respondents) brought an action against defendants and appellants W. R. Tomson and the Family of Faith Foundation (individually, Tomson and the Foundation, and collectively, appellants), charging violations of three California statutes which prohibit religious discrimination (Civ. Code, §§ 51, 51.5; Bus. & Prof. Code, § 16721; Bus. & Prof. Code,

---

[1] The Anti-Defamation League of B'nai B'rith (the ADL) is a tax exempt, nonprofit corporation, organized under the laws of the District of Columbia, which maintains a branch office in Los Angeles, California. B'nai B'rith is a civic organization of American Jews. The ADL was organized in 1913 as a section of B'nai B'rith to advance goodwill and mutual understanding among Americans of all religions, races, and creeds and to combat racial and religious prejudice in the United States.

§ 17200 et seq.). The trial court found for respondents and issued a wide-ranging judgment for injunctive and monetary relief. We affirm in part and reverse in part for the reasons stated below.

FACTS

Since 1976, Tomson and his successor-in-interest, the Foundation, have owned and operated a business telephone directory called the "Christian Yellow Pages" (the CYP), which will only accept advertisements placed by a person who affirms orally and in writing that he has accepted Jesus Christ as his personal savior and is a "born-again" Christian.[2]

Each CYP directory contains a full page message from the publishers of CYP, denominated "The Christian Yellow Pages Concept," which states: "The publishers of Christian Yellow Pages hold the Bible to be the Inspired Word of God, the Rule Book for Life which presents Jesus Christ, God's only begotten Son, whose death and bodily resurrection provide forgiveness from sin and eternal life. His indwelling presence through the Holy Spirit gives power and purpose to our living. It is the Christian's duty and privilege to give this message of hope to the whole world until the return of Jesus Christ for the establishment of His Kingdom.

"In publishing the CYP directory we are often asked 'Who is a Christian?' By Christian we mean those who have accepted the fact that Jesus came to this earth—died on the cross of Calvary to pay for OUR sins— was resurrected—and lives Now in the hearts of those who believe.

"Those whose advertisements appear in the CYP directory have declared orally and in writing that this is their position in Christ—and are standing up and being counted as Christians in our community.

"One of the primary purposes of the CYP directory is to strengthen the Christian community in which it is being published by pointing out some of the many businesses operated by Christians—therefore offering the entire community the opportunity to do business with Christian business people.

"Please recognize the fact that a Christian businessman advertising [*sic*] in the CYP directory does not mean that all of his employees are Christians—nor does it mean that a Christian employee placing an ad in the directory imply [*sic*] that his employer is a Christian—so we urge the user

---

[2]The religious oath states: "Advertiser Herewith Acknowledges The Fact That He Has Accepted Jesus Christ As His Personal Lord And Savior And According To The Holy Bible (John 1:13) Knows That He Is A Born-Again Christian."

to contact the individual Christian listed wherever possible, and if indeed the user is a Christian we urge him to identify himself as a fellow Christian—thereby further uniting the Body of Christ.

"Advertising in the CYP directory does not mean that the advertiser is any cheaper in his prices, nor does it necessarily mean that the quality of his work is any better than his competitor—what it does mean is that his stand in Christ should guarantee that he is doing his level best—that he is honest and fair in his prices—and that the purchaser should be entitled to and receive courteous—considerate and Christian treatment in all transactions.

"If we have missed you in this edition and you would like to have been included—please forgive us—we tried to contact all Christian people whose names we were able to obtain. Please call or write and you will be contacted before the next edition is published.

"Our prayer is that this directory will be accepted in the Spirit in which it has been published. We ask the Christian community to patronize these Christian advertisers—and any other Christian business people that they are able to locate.

"As we have therefore opportunity, let us do good unto all men, especially unto them who are of the household of faith. (Gal: 6:10.)"

Tomson was the sole owner of the CYP logo and federally registered trademark until August 15, 1977, when he transferred to the Foundation all of his rights, interests, duties and obligations in the CYP, including the logo, the trademark and the right to receive royalties from the sale of CYP advertisements or listings. Thereafter, on August 29, 1977, the Foundation was incorporated under the laws of California as a nonprofit religious corporation, with its "National" or home office in Modesto, California. Tomson is president of the Foundation and a member of its board of directors.

The CYP is modeled after the "Yellow Pages" of a telephone company and contains primarily advertisements and listings paid for by business or professional people and offers for sale secular or commercial goods and services. Christian adages and symbols and Biblical quotations occur on most pages of the directories. Each directory is published for one of nine separate geographical regions in the United States and the advertisements and listings are grouped according to region.

The "Contract of Appointment of Regional Director" between Tomson, as the national director of the CYP, and the CYP regional director for the

region which includes California, requires that the regional director accept orders for advertising space only from persons who qualify as "born-again" Christians.

Respondents Pines and Aronek are partners in Grecian Art Tiles, which imports tiles from Greece, some of which depict Christian images and scenes. On August 15, 1977, Pines and Aronek attempted to place an advertisement of their wares in the CYP. Because they are of the Jewish faith, Pines and Aronek could not and would not sign nor utter the "born-again" Christian oath. For that reason, they were not allowed to place their advertisement in the CYP. Pines and Aronek, joined by the ADL, acting as a private attorney general, brought the instant action against appellants, seeking damages and injunctive relief.

The trial court determined, inter alia, that publication and distribution by Tomson and the Foundation of "The Christian Yellow Pages Concept" in the CYP were acts of discriminatory business conduct on the basis of religion and acts which aid or incite discriminatory business conduct on the basis of religion; that their refusal to accept advertisements or listings from any person who refused to affirm he is a "born-again" Christian was arbitrary and discriminatory business conduct on the basis of religion; that their conduct and activity in producing, publishing and distributing the CYP and soliciting and selling advertisements and listings was secular commercial conduct performed for profit and, thus, the CYP was a "business establishment" within the meaning of Civil Code sections 51, 51.5 and 52; that their conduct in aiding and inciting discriminatory business conduct on the basis of religion violated Civil Code sections 51, 51.5 and 52; that their required exclusion of persons from "business transactions" on the basis of religion, by means of a policy expressed in a written document, violated Business and Professions Code section 16721; that their conduct constituted "unlawful and unfair business practices and unfair competition" which violated Business and Professions Code section 17200 et seq.; that their discriminatory conduct "is not protected activity under the freedom of speech, press, association, or free exercise of religion provisions of the United States Constitution or the California State Constitution; and that their discriminatory conduct caused Pines and Aronek to suffer actual injury and damages in the amount of $250.00."

The trial court's judgment awarded Pines and Aronek $250 each in damages, awarded Pines, Aronek and the ADL costs and reasonable attorneys fees and enjoined appellants from (1) requiring advertisers or listers in the CYP to affirm they are "born-again" Christians, (2) publishing in the CYP any "concept" statement or editorial policy, as exemplified by "The Christian Yellow Pages Concept," *supra,* and (3) publishing advertisements

or material in the CYP which requires direct or indirect identification of the advertisers' or listers' religious affiliation.[3] Appellants timely appealed from the trial court's judgment.

CONTENTS

Appellant contends:

I. There is insufficient evidence to support the trial court's determination that appellants' conduct and activities violated California statutory law (Civ. Code, §§ 51, 51.5, 52; Bus. & Prof. Code, §§ 16721, 16750; Bus. & Prof. Code, § 17200 et seq.) because:

A. Respondents lacked standing to sue for alleged violations of "the unfair competition" statute, Business and Professions Code section 17200 et

---

[3]That portion of the trial court's judgment which enjoined Appellants' future conduct was set forth in three separately numbered paragraphs:

"It is ORDERED, ADJUDGED, AND DECREED that defendants W. R. Tomson and the Family of Faith Foundation, their officers, agents, servants and employees, as well as agents of any subsidiary or corporation which are controlled by defendants W. R. Tomson or the Family of Faith Foundation or their successors in interest shall be and they are hereby permanently enjoined and restrained from, and shall not engage in, commit, or perform, directly or indirectly, by means whatsoever, any of the following acts:

"1. Require that plaintiffs David Pines and George Aronek, dba Grecian Art Tiles, the Anti-Defamation League of B'nai B'rith, or any member of the general public, in or outside of California, who seeks to place or places an advertisement or listing in any or all of defendants' or Christian Yellow pages, Inc.'s publications, in or outside of California, declare, state, acknowledge, affirm or indicate, in any manner whatsoever, including but not limited to oral or written statements, that said person or persons is a member of any religious faith or adheres to a particular religious belief, affiliation, or theology, including but not limited to those beliefs held by 'born-again' Christians; nor refuse to accept advertisements or listings, in any or all of the defendants' or Christian Yellow Pages, Inc.'s publications, in or outside of California, on the basis of the religious affiliation, beliefs, or theology of the person who seeks to place or places advertisements or listings, or the religious affiliation, beliefs, or theology of any person or persons associated with or employed by the person who seeks to place or places advertisements or listings. Nothing herein shall limit the right of defendants or Christian Yellow Pages, Inc. to exercise reasonable editorial judgment over the content of any advertisements or listings. The foregoing exclusion shall be deemed to include a prohibition against the exclusion from advertisements or listings, based upon the existence or non-existence of any personal religious experience, including the experience described as 'born-again' Christianity.

"2. Publish any concept statement or statement of editorial policy such as exemplified in the concept letter at page 3 of the 1977 edition of the Orange County Christian Yellow Pages . . . or as exemplified at page 4 in the 1978 edition of the Christian Yellow Pages . . . by the language 'In publishing the CYP Directory we are often asked . . .' or at page 11 of the same edition as exemplified by the language '. . . —what it does mean is that his stand in Christ should . . .', and again in the language at the same site quoted as follows '. . . and Christian treatment . . . .'

"3. Publish advertisements or material of any kind whatsoever, in any of the publications of defendants' or Christian Yellow Pages, Inc., in or outside of California, which requires direct or indirect identification of an advertiser's or lister's religious affiliation, belief or theology in any manner whatsoever, except that advertisers or listers may identify themselves as Christians or use Christian logos or symbols."

seq., since they were not competitors of the appellants and did not allege the consuming public has been injured by appellants' conduct.

B. Respondents lacked standing to sue for alleged violations of Business and Professions Code section 16721 since they suffered no demonstrable injury to their "business or property" as required by Business and Professions Code section 16750.

C. A private nonprofit religious corporation which publishes directories of "born-again" Christian business and professional people is not a "business establishment" within the meaning of the Unruh Civil Rights Act, Civil Code sections 51, 51.5 and 52, nor a "business" within the meaning of the "conspiracy against trade" statute, Business and Professions Code section 16721, or the "unfair competition" statute, Business and Professions Code section 17200 et seq.

D. Even if a private nonprofit religious corporation which publishes directories of "born-again" Christian business and professional people is a "business establishment" within the meaning of the Unruh Civil Rights Act, Civil Code sections 51, 51.5 and 52, for reasons of public policy, the act does not apply to its activities.

II. The trial court's judgment, applying the California antidiscrimination statutes (Civ. Code, §§ 51, 51.5, 52 and Bus. & Prof. Code, §§ 16721 and 17200 et seq.) to regulate the content of appellants' directories, violates appellants' rights to freedom of speech, press, religion and association under the federal and state Constitutions.

III. The trial court's judgment must be reversed as it is void for vagueness and overbreadth.

## DISCUSSION

## I. A.

*Respondents had standing to sue appellants for alleged violations of "the unfair competition" statute, Business and Professions Code section 17200 et seq.*

In the fourth cause of action of their complaint, respondents Pines, Aronek and the ADL sought injunctive relief under the "unfair competition" statute, Business and Professions Code section 17200 et seq. (formerly Civ. Code, § 3369, subds. 2-6). Appellants contend respondents lacked standing to sue for alleged violations of that statute because (1) they were not com-

petitors of the appellants and (2) they did not allege the consuming public has been injured by appellants' conduct. Appellants have misstated both the law and the facts.

Business and Professions Code section 17200 provides: "As used in this chapter, *unfair competition* shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising . . . ." (Italics added.) Section 17203 provides: "Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction."

In *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660], the Supreme Court noted that the section 17200 proscription of "unfair competition" *is not confined to anticompetitive business practice but extends to "any unlawful business practice."* (*Id.,* at pp. 209-210, italics added.) The court noted that the Legislature apparently intended to permit courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur. (*Id.,* at p. 210; *Stoiber* v. *Honeychuck* (1980) 101 Cal.App.3d 903, 927 [162 Cal.Rptr. 194]; see *People* v. *McKale* (1979) 25 Cal.3d 626, 632 [159 Cal.Rptr. 811, 602 P.2d 731]; *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817].)

Section 17204 provides: "Actions for injunction pursuant to this chapter may be prosecuted by the Attorney General or any district attorney . . . upon their own complaint or upon the complaint of any board, officer, person, corporation, or association, or by *any person acting for the interests of itself, its members or the general public.*" (Italics added.) The emphasized language has been construed to mean that " 'suit may be brought by any person acting in his own behalf *or* on behalf of the general public.' [Citations.]" (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d at p. 215, italics in original; *Hernandez* v. *Atlantic Finance Co.* (1980) 105 Cal.App.3d 65, 72 [164 Cal.Rptr. 279].)

Our review of the record does not support appellants' contention that respondents have not alleged injury to the consuming public. In their fourth cause of action, respondents specifically alleged that they were seeking injunctive relief "on behalf of themselves and the general public," that "as a direct and proximate result of defendants' unfair business practice, members of the general public including business persons of all religious faiths other than 'Born-Again' Christians . . . are subject to defendants' discriminatory pattern and practice and excluded from advertising in said periodicals" and that "members of the general public discriminatorily excluded . . . will continue to suffer irreparable injury . . . ."

We conclude, therefore, that respondents had standing to bring the instant action for injunctive relief either on their own behalf or on behalf of the general public.

## I. B.

*Respondents had standing to sue appellants for alleged violations of "the conspiracy against trade" statute, Business and Professions Code section 16721.*

Appellants contend respondents lacked standing to sue for violations of "the conspiracy against trade" statute, Business and Professions Code section 16721, because they did not demonstrate at trial the requisite injury to their "business or property."

Section 16721, subdivisions (a) and (b), prohibits the exclusion of any person from a business transaction on the basis of an express discriminatory policy *imposed by a third party*.[4] Section 16750 provides that a person injured in "his or her business or property" by anything forbidden or declared unlawful in the chapter, which includes section 16721, may sue there-

---

[4]Business and Professions Code section 16721 provides: "Recognizing that the California Constitution prohibits a person from being disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin, and guarantees the free exercise and enjoyment of religion without discrimination or preference; and recognizing that these and other basic, fundamental constitutional principles are directly affected and denigrated by certain on-going practices in the business and commercial world, it is necessary that provisions protecting and enhancing a person's right to enter or pursue business and to freely exercise and enjoy religion, consistent with law, be established.

"(a) No person within the jurisdiction of this state shall be excluded from a business transaction on the basis of a policy expressed in any document or writing and imposed by a third party where such policy requires discrimination against that person on the basis of the person's sex, race, color, religion, ancestry or national origin or on the basis that the person conducts or has conducted business in a particular location.

"(b) No person within the jurisdiction of this state shall require another person to be excluded, or be required to exclude another person, from a business transaction on the basis of a policy expressed in any document or writing which requires discrimination against such other person on the basis of that person's sex, race, color, religion, ancestry or national origin or on the basis that the person conducts or has conducted business in a particular location.

"(c) Any violation of any provision of this section is a conspiracy against trade.

"(d) Nothing in this section shall be construed to prohibit any person, on this [*sic*] basis of his or her individual ideology or preferences, from doing business or refusing to do business with any other person consistent with law."

fore and that such action may be brought "by any person who is injured in his business or property . . . ."[5]

Appellants urge that since respondents were unable to prove at trial that they suffered any consequential damage by reason of appellants' conduct, their standing was thereby negated. We find appellants' "standing" argument to be completely lacking in merit. ■ Having alleged that as a direct result of appellants' discriminatory conduct in violation of section 16721 "plaintiffs have been damaged and are entitled to $4500," respondents have established standing. (See *Burke* v. *Superior Court* (1982) 128 Cal.App.3d 661, 665, fn. 5 [180 Cal.Rptr. 537].)

In their reply brief, appellants also urge that respondents have failed to prove a cause of action under section 16721, because the evidence is insufficient to show they were injured in their "business or property." Appellants point to the court's explanation for its damage award at the conclusion of trial as support for their theory that the court determined respondents suffered no compensatory or actual damages. Appellants argue that the court's language indicates it intended only to award respondents the minimum $250 statutory penalty required by Civil Code section 52, subdivision (a),[6] for violations of Civil Code sections 51 and 51.5.

We have reviewed the statements of the trial court at the time it awarded damages to respondents,[7] and have concluded that its comments, read in

---

[5]Business and Professions Code section 16750 provides in pertinent part: "(a) Any person who is injured in his or her *business or property* by reason of anything forbidden or declared unlawful by this chapter, may sue therefor . . . to recover three times the damages sustained by him or her, interest on his or her actual damages pursuant to·Section 16761, and shall be awarded a reasonable attorneys' fee together with the costs of the suit.

"Such action may be brought by any person who is injured in his *business or property* by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant." (Italics added.)

[6]See footnote 8, *infra*.

[7]"THE COURT: I realize the importance of the case to all of the parties involved, but I find from the evidence that the plaintiffs are entitled to a judgment in this matter under the First, Second, and Fourth Causes of Action.

"I find that there is a violation, the conduct of the defendants is in violation of the provisions of the *Civil Code* sections 51, 51.5, and 52, and also in violation of section 16721 of the *Business and Professions Code*.

"I find that the conduct complained of is in fact discriminatory and that plaintiffs are entitled to injunctive relief to prevent its recurrence.

"With respect to the matter of damages, I award damages to each of the defendants, Pines and Aronek, in the minimum sum specified in the *Civil Code* section, namely, $250 each." (Original italics.)

"[RESPONDENTS' ATTORNEY]: And may I inquire as to the treble-damages provision of the *Code*, is that something that automatically trebles the damages?

"[APPELLANTS' ATTORNEY]: No, it doesn't.

"THE COURT: No, I don't believe so. [¶] From my reading of the *Code* section, $250 is

context, do not support appellants' theory that the trial court determined respondents suffered no injury to their "business or property" within the meaning of Business and Professions Code section 16750. Moreover, appellants' theory is contradicted by the trial court's written findings of fact and conclusions of law in which it specifically stated that "the discriminatory conduct of defendants . . . proximately caused injury and actual damage to plaintiffs . . . Pines and . . . Aronek . . . and each said plaintiff is entitled to recover the sum of $250 from defendants . . . ."

Accordingly, we hold that respondents had standing to bring the instant action pursuant to Business and Professions Code sections 16721 and 16750, and that substantial evidence supports the trial court's determination that respondents were entitled to an award of damages under the authority of those sections.

## I. C.

*The CYP is a "business establishment" within the meaning of the Unruh Civil Rights Act (Civ. Code, §§ 51, 51.5), and its activities fall within the meaning of a "business practice" as that term is used in the "unfair competition" statute (Bus. & Prof. Code, § 17200 et seq.) and a "business transaction" as that term is used in the "conspiracy against trade" statute (Bus. & Prof. Code, § 16721).*

Appellants note that the "unfair competition statute" (Bus. & Prof. Code, § 17200 et seq.) applies to a "business practice," the "conspiracy against trade" statute (Bus. & Prof. Code, § 16721) applies to a "business transaction," and the Unruh Civil Rights Act (Civ. Code, §§ 51, 51.5) applies to "business establishments." They therefore argue that because they do not operate a "business establishment," their activities are not proscribed by those statutes. Appellants' argument is based on the fact that the CYP is published under the formal aegis of a nonprofit religious corporation and their belief that their work is a "ministry."

The 1959 Unruh Civil Rights Act, Civil Code section 51, emanated from and was modeled upon traditional "public accommodations" legislation. The Unruh Civil Rights Act expanded the reach of such statutes from common carriers and places of public accommodation and recreation, e.g., railroads, hotels, restaurants, theaters, and the like, to include "all business establishments of every kind whatsoever." (See *Marina Point, Ltd.* v. *Wolf-*

---

the minimum amount of damages where the Court believes that the plaintiff has failed to establish a specific sum of money as damages.

"I appreciate that there was testimony regarding the figure of $1,500, but I do not make that award; I awarded instead the $250, which is a minimum." (Original italics.)

*son* (1982) 30 Cal.3d 721, 731 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161], cert. den. 459 U.S. 858 [74 L.Ed.2d 111, 103 S.Ct. 129]; and see *O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790, 793-794 [191 Cal.Rptr. 320, 662 P.2d 427]; *Curran* v. *Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712, 726-727 [195 Cal.Rptr. 325].)

Civil Code section 51 provides in part: "All persons . . . are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all *business establishments of every kind whatsoever.*" (Italics added.)

In 1976 the Legislature added Civil Code section 51.5 to the Unruh Civil Rights Act and amended Civil Code section 52[8] (which provides penalties for those who violate the Unruh Civil Rights Act), in order to, inter alia, include section 51.5 in its provisions. (See *Review of Selected 1976 California Legislation* (1977) 8 Pacific L.J. 165, 201.)[9]

Section 51.5 provides in part: "No *business establishment of any kind whatsoever* shall discriminate against . . . refuse to buy from, sell to, or trade with any person . . . because of the race, creed, religion, color, national origin, or sex of such person . . . ." (Italics added.)

■■■ Although the phrase "business establishment of every kind whatsoever" has been interpreted by the Supreme Court (*O'Connor* v. *Village Green Owners Assn., supra,* 33 Cal.3d 790, 796-797; *Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463, 468-469 [20 Cal.Rptr. 609, 370 P.2d 313]) and the Court of Appeal (*Curran* v. *Mount Diablo Council of the Boy Scouts, supra,* 147 Cal.App.3d at pp. 727-733) in the context of section 51, we are aware of no case which interprets that term in the context of section 51.5. We believe, however, that the Legislature meant the identical language in both sections to have the identical meaning.

In *O'Connor,* the Supreme Court held that the owners association of a condominium development was a "business establishment" within the meaning of section 51 and that any age restriction established by the asso-

---

[8]Civil Code section 52 provides in pertinent part: "(a) Whoever denies, or who aids, or incites such denial, or whoever makes any discrimination, distinction or restriction on account of sex, color, race, religion, ancestry, or national origin contrary to the provisions of Section 51 or 51.5, is liable for each and every such offense for the actual damages, and such amount as may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than two hundred fifty dollars ($250), and such attorney's fees as may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51 or 51.5."

[9]Statutes 1976, chapter 366, sections 1, 2, page 1013.

ciation was invalid. The *O'Connor* court, quoting from *Burks* v. *Poppy Construction Co., supra,* 57 Cal.2d at pages 468-469, discussed the scope of the language of section 51: " 'The Legislature used the words "all" and "of every kind whatsoever" in referring to business establishments covered by the Unruh Act (Civ. Code, § 51), and the inclusion of these words without any exception and without specification of particular kinds of enterprises, leaves no doubt that the term "business establishments" was used in the broadest sense reasonably possible. The word "business" embraces everything about which one can be employed, and it is often synonymous with "calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain." [Citations.] The word "establishment," as broadly defined, includes not only a fixed location, such as the "place where one is permanently fixed for residence or business," but also a permanent "commercial force or organization" or "a permanent settled position (as in life or business)." [Citation.]' " (33 Cal.3d at p. 795.)

The *O'Connor* court noted that the original version of the bill presented to the Legislature, in addition to affording protection in "business establishments," referred specifically to the right "to purchase real property" and to other rights, such as the obtaining of "professional" services. (33 Cal.3d at p. 795; see *Burks* v. *Poppy Construction Co., supra,* 57 Cal.2d at p. 469.) The final version, however, eliminated specific references and added to the term "business establishments" the words "of every kind whatsoever." (*Ibid.*) The deletion of the specific references were explained in *Burks* and *O'Connor* on the ground that the Legislature deemed specific references no longer necessary in view of the broad language of the act as finally passed. (*Ibid.*)

The Supreme Court stated in *O'Connor* that the broad scope of business establishments in the final version of the bill "is indicative of an intent by the Legislature to include therein all formerly specified private and public groups or organizations that may reasonably be found to constitute 'business establishments of every type whatsoever.' " (33 Cal.3d at pp. 795-796.) Therefore, the court held that the Unruh Civil Rights Act covered even nonprofit organizations. (*Id.*, at p. 796.) The court noted: "Indeed, hospitals are often nonprofit organizations, and they are clearly business establishments to the extent that they employ a vast array of persons, care for an extensive physical plant and charge substantial fees for those who use the facilities." (*Ibid.*)

Following on the heels of *O'Connor,* the Court of Appeal in *Curran* v. *Mount Diablo Council of the Boy Scouts, supra,* 147 Cal.App.3d 712, also examined *Burks* v. *Poppy Construction Co., supra,* 57 Cal.2d 463, and concluded that in *Burks* the court had determined the Legislature intended

the word "business" in the Unruh Civil Rights Act to include *noncommercial* as well as commercial entities. (147 Cal.App.3d at pp. 728-729.) Therefore, the *Curran* court held that the term "business establishments," consistent with the Legislature's intent to use the term in the broadest sense reasonably possible, includes all commercial and *noncommercial* entities open to and serving the general public. (*Id.*, at pp. 732-733.) Accordingly, it held that the Boy Scouts is a "business establishment" within the meaning of the Unruh Civil Rights Act (*id.*, at p. 733) and under that act, the Boy Scouts are prohibited from arbitrarily discriminating against homosexuals (*id.*, at p. 734).

In the instant case, appellants urge that they are a nonprofit organization and that their activities in connection with the CYP were noncommercial. While the CYP certainly had "businesslike attributes,"[10] as did the condominium owners association in *O'Connor* (*O'Connor* v. *Village Green Owners Assn.*, *supra*, 33 Cal.3d at p. 796), the CYP "fits both the commercial and noncommercial aspects of the meaning of 'business establishment.'" (*Curran* v. *Mount Diablo Council of the Boy Scouts*, *supra*, 147 Cal.App.3d at p. 730.)

We hold, therefore, that the CYP is a "business establishment" within the meaning of the Unruh Civil Rights Act (Civ. Code, §§ 51, 51.5) and that its activities fall within the meaning of a "business practice" as that term is used in the "unfair competition" statute (Bus. & Prof. Code, § 17200 et seq.) and a "business transaction" as that term is used in the "conspiracy against trade" statute (Bus. & Prof. Code, § 16721).

## I. D.

*Appellants argument that they are entitled to a special "public policy" exception from the Unruh Act is a constitutional argument in disguise.*

Appellants creatively argue that they are entitled to a special "public policy" exception from the Unruh Act. This argument is based on *Marina*

---

[10]Respondents assert in their brief: "CYP's business nature was amply demonstrated by, *inter alia*: (1) its solicitation and sale of commercial advertisements or listings; (2) the substantial and required monetary fee charged for each advertisement or listing; (3) the collection of royalties and the derivation of income from the sale of advertising space (4) the fact that the CYP directories are patter[n]ed after the telephone companies' 'Yellow Pages' and consist primarily of commercial advertisements or listings that have been paid for by business or professional people and which offer the sale of secular goods and services; (5) the 'Contract of Appointment of Regional Director'; (6) the proprietary history of the CYP operation with W. R. Tomson as National Director; (7) the commercial use of the Christian Yellow pages logo and federally registered trademark and (8) W. R. Tomson's admissions as to CYP's commercial and economic purpose." (Citations and fn. omitted.)

*Point, Ltd.* v. *Wolfson, supra,* 30 Cal.3d 721, in which the Supreme Court noted that, while age discrimination against children in housing is generally impermissible under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.), in light of the unique housing needs of senior citizens (a problem addressed by both the state and federal governments in specific "'age-conscious'" legislative measures), retirement communities and other housing designed for senior citizens are excluded from the act's prohibition of housing discrimination against children. (*Id.,* at pp. 742-743.) Appellants claim that because freedom of religion is a fundamental constitutional value, they are entitled to a similar exemption for their "ministry."

However, the "public policy" exemption for senior citizens housing which was recognized in *Marina Point* had a *statutory,* not a constitutional, basis. Appellants' "public policy" argument has no statutory basis, but is a constitutional argument in disguise, i.e., that religious liberty as guaranteed by the First Amendment warrants an exclusion for appellants from the civil rights laws. As a constitutional argument, we address it as such, rather than under a less rigorous, and in this context, somewhat ill-defined "public policy" analysis.

## II.

*Appellants' constitutional freedoms are impaired by that portion of the trial court's order which enjoins their publication of editorial material in the CYP, but not by that portion of the order which prohibits their discriminatory acts.*

The trial court's injunctive order contains three paragraphs. Paragraph 1 enjoins appellants' discriminatory business practices by prohibiting appellants from requiring an oath or affirmation of a particular religious belief as a precondition to placing an advertisement in the CYP. Paragraphs 2 and 3 enjoin appellants from publishing certain editorial materials.

Appellants assert their freedoms of speech, press, religion and association would all be impaired by enforcement of the trial court's injunction and contend the judgment must be reversed in its entirety. Respondents urge that the trial court's order must be affirmed in toto.

We have concluded, however, that paragraph 1 of the trial court's order does not unconstitutionally impair protected freedoms and must be upheld, that paragraph 2 of the trial court's order is violative of free speech rights guaranteed by the federal and state Constitutions and must be stricken, and that paragraph 3 of the trial court's order is unnecessary to the judgment and should also be stricken.

## II. A.

*Paragraph 1 of the trial court's injunction, which prohibits appellants' discriminatory business practice of requiring an oath or affirmation of a particular religious belief as a precondition to placing an advertisement in the CYP, does not impair constitutionally protected freedoms.*

█ Paragraph 1 of the trial court's injunctive order may arguably be said to implicate appellants' First Amendment freedoms of religion and association. A review of the facts, however, shows that appellants have failed to demonstrate that the court's order would materially abridge the free exercise of their religion in any way.

1. *Paragraph 1 does not abridge appellants' right to free exercise of religion.*

Although the trial court specifically found that publication of the CYP was secular commercial conduct which was performed for profit, the court did not make any findings as to the religious or other motivations of appellants. Appellants maintain strenuously, that the overriding purpose of the CYP is religious in nature, that their purpose is "to teach and preach the Gospel and teachings of Jesus Christ," and that the CYP is published "for the purpose of mobilizing Christians to declare and propagate their faith in the workplace and to live their faith as they do their jobs." Indeed, each edition of the CYP directory contains the "Christian Yellow Pages Concept" which declares: "One of the primary purposes of the CYP directory is to strengthen the Christian community in which it is being published by pointing out some of the many businesses operated by Christians—therefore offering the entire community the opportunity to do business with Christian business people."

Paragraph 1 of the trial court's injunctive order does not materially interfere with the accomplishment of those purposes. Nothing in paragraph 1 prevents the proprietors of the CYP or their advertisers from declaring "their position in Christ" or from "standing up to be counted" as members of the Christian community. Moreover, nothing in paragraph 1 prevents advertisers who wish to do so from identifying themselves as Christians in their advertisements. Paragraph 1 does not materially interfere with the freedom of any person to believe in the appellants' version of Christianity, nor with any person's ability to propagate Christian beliefs.

Paragraph 1 simply enjoins appellants from refusing advertisements on the ground the person attempting to place an advertisement is not, or will not affirm that he is, a "born-again" Christian. Thus, the religious purposes

appellants have asserted for publishing the CYP are not impaired by paragraph 1 of the trial court's order.

Further, the express "primary" religious purpose of the CYP, to offer "the entire community the opportunity to do business with Christian business people," is not materially served by requiring the person who places an advertisement in the CYP to affirm he is a "born-again" Christian.

Nothing in the CYP's present advertising policy offers assurance that the advertisers themselves are in fact "Christian business people." Appellants do not require that the proprietors or managers of the businesses advertising in the CYP in fact be Christians; they require only that the *employee* placing the ad so testify, as the fifth paragraph of the "Concept" makes plain. That paragraph states: "Please recognize the fact that a Christian businessman advertising [*sic*] in the CYP directory does not mean that all of his employees are Christians—nor does it mean that a Christian employee placing an ad in the directory imply [*sic*] that his employer is a Christian . . . ." Therefore, the stated "primary" religious purpose of the CYP could more effectively be served by simply allowing Christian business proprietors to identify themselves as such in their advertisements by word or symbol.

Appellants contend, however, that compelling them to accept advertisements from non-Christians would force appellants to subscribe to non-Christian beliefs in violation of *Board of Education* v. *Barnette* (1943) 319 U.S. 624 [87 L.Ed. 1628, 63 S.Ct. 1178, 147 A.L.R. 674]. On the contrary, paragraph 1 does not require appellants to endorse the religious beliefs, or even the business practices, of non-Christian advertisers, or to alter their own beliefs. It merely requires appellants to *act* in a nondiscriminatory manner toward all prospective advertisers. A legal compulsion by court order to refrain from discriminating against advertisers on the basis of religion can hardly be characterized as an endorsement. In any event, appellants can publish whatever disclaimers are necessary to assure that their compliance with the court order to treat all advertisers equally is not confused with indorsement. (See *Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74, 87-88 [64 L.Ed.2d 741, 756, 100 S.Ct. 2035].)

In finding a law firm's discrimination on the basis of sex is unlawful under title VII of the Civil Rights Act (42 U.S.C.S. § 2000e et seq.) in *Hishon* v. *King & Spaulding* (1984) — U.S. —, — [81 L.Ed.2d 59, 68, 104 S.Ct. 2229], the United States Supreme Court stressed that the defendant law firm had not shown how its ability to engage in First Amendment activities would be inhibited by a requirement that it consider a woman lawyer for partnership on her merits. Similarly, in *Roberts* v. *United States Jaycees* (1984) — U.S. —, — [82 L.Ed.2d 462, 477, 104 S.Ct. 3244], the Supreme Court

stated defendant Jaycees had failed to show that application of the Minnesota Human Rights Act to the Jaycees, to compel them to admit women as full members, imposed "any serious burdens" on the male members' First Amendment freedoms.

Here, appellants have not shown that application to them of paragraph 1 of the trial court's injunction would materially abridge their rights to free exercise of religion. Thus, we need not undertake a free exercise analysis.[11]

2. *Paragraph 1, which infringes on appellants' freedom of religious association, is justified by the compelling government interest in eradicating invidious discrimination.*

Appellants contend the trial court's order violates their freedom of religious association. In response to a similar contention made by the Jaycees, who were seeking to avoid application to them of the state antidiscrimination laws, the Supreme Court, in *Roberts* v. *United States Jaycees, supra,* — U.S. — [82 L.Ed.2d 462], found that two distinct varieties of associational freedom had to be considered, the "freedom of intimate association and . . . [the] freedom of expressive association." (— U.S. at p. — [82 L.Ed.2d at p. 471].)

Freedom of "intimate association" receives protection as "an intrinsic element of personal liberty." (*Roberts* v. *United States Jaycees, supra,* — U.S. —, — [82 L.Ed.2d 462, 472-473].) These highly personal affiliations are exemplified by relationships such as marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. (— U.S. at p. — [82 L.Ed.2d at pp. 472-473.) In the instant case, appellants operate a telephone directory business which accepts paid listings from business persons engaged in the sale for profit of secular goods and services. Appellants' business has been operated for profit and operates interstate, publishing nine regional editions. Apart from religious creed, appellants apparently employ no criteria, other than financial, to determine which parties are acceptable telephone directory advertisers. Indeed, as discussed, *supra,* business persons seeking to advertise in the CYP directory need not themselves be Christians. Thus, like the Jaycees in *Roberts,* appellants' operation lacks the distinctive characteristics which would entitle them to claim their

---

[11]Compare this case with *Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 218-219 [32 L.Ed.2d 15, 27, 92 S.Ct. 1526] (which held application of compulsory school attendance laws to Amish children after eighth grade would gravely endanger continuance of their religious way of life) and *People* v. *Woody* (1964) 61 Cal.2d 716, 720-722 [40 Cal.Rptr. 69, 394 P.2d 813] (which held application of a criminal statute to American Indians using peyote in a bona fide religious ceremony would tear out "the theological heart" of Native American religion).

freedom of "intimate association" has been violated by the trial court's order. (*Id.*, at p. — [82 L.Ed.2d at pp. 473-474].)

With regard to the freedom of "expressive association," the Supreme Court stated in *Roberts*: "An individual's freedom to speak, to worship, and to petition the Government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. . . . Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." (*Roberts* v. *United States Jaycees, supra,* — U.S. —, — [82 L.Ed.2d 462, 474].) In view of appellants' express religious purposes in publishing the CYP and "the scriptural teachings of not associating with non-believers," the freedom of "expressive association" is plainly implicated here. Freedom of association "presupposes a freedom not to associate." (*Id.*, at p. — [82 L.Ed.2d at p. 475].)

In the instant case, the consequence of paragraph 1 of the trial court's injunctive order is to compel appellants to do business with—to "associate" with—non-Christian advertisers in spite of their religious beliefs. "The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." (*Roberts* v. *United States Jaycees, supra,* — U.S. —, — [82 L.Ed.2d 462, 475].) Here, that high standard is satisfied.

As a general proposition, "government has a compelling interest in eradicating discrimination in all forms." (*E. E. O. C.* v. *Mississippi College* (5th Cir. 1980) 626 F.2d 477, 488, cert. den. (1981) 453 U.S. 912 [69 L.Ed.2d 994, 101 S.Ct. 3143] [upholding application of civil rights laws to a pervasively sectarian college].) While the application of the antidiscrimination laws over First Amendment objections has chiefly occurred in the context of racial or sexual discrimination (see *Runyon* v. *McCrary* (1976) 427 U.S. 160 [49 L.Ed.2d 415, 96 S.Ct. 2586]; *Hishon* v. *King & Spaulding, supra,* — U.S. — [81 L.Ed.2d 59]), California has chosen to broadly interdict discrimination on the basis of religion on the same terms and for the same reasons as discrimination on other invidious bases.

Thus, the California statutes at issue here may be viewed as implementing not only the Fourteenth Amendment's promise of equality, but also the greater guarantee of the California Constitution's equal protection clause,

article I, section 7, subdivision (a), and the guarantee of equality in the workplace and marketplace, provided by article I, section 8, which has no federal counterpart. California's interest in eradicating discrimination on the basis of race or sex is unquestionably "compelling" and is "unrelated to the suppression of ideas . . . ." (*Roberts* v. *United States Jaycees, supra,* — U.S. —, — [82 L.Ed.2d 462, 475].)

The only question remaining, therefore, is whether the state's interest can be achieved by "less restrictive" means (*Roberts* v. *United States Jaycees, supra,* — U.S. —, — [82 L.Ed.2d 462, 475]) than by the application of paragraph 1 of the trial court's order to appellants. Clearly, it cannot. Paragraph 1 implements the state's interest in ending religious discrimination in business activity by prohibiting the discriminatory business practices of the CYP. Paragraph 1 " 'responds precisely to the substantive problem which legitimately concerns' the State and abridges no more . . . associational freedom than is necessary to accomplish that purpose." (*Id.*, at p. — [82 L.Ed.2d at p. 478].)

Paragraph 1 is the *sine qua non* of the trial court's injunction. Although it undeniably infringes on appellants' freedom of religious association by requiring them to do business with non-Christians despite their preference to the contrary, that infringement is amply justified by the compelling state interest in eradicating invidious discrimination. Religious liberty "embraces two concepts,—freedom to believe and freedom to act. The first is absolute, but in the nature of things, the second cannot be." (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1218, 60 S.Ct. 900].)

## II. B.

*Paragraph 2 of the trial court's injunction, which restrains statements of editorial opinion prior to publication, violates the free speech guarantees of the California and United States Constitutions.*

Respondents assert that "The Christian Yellow Pages Concept" is nothing more than invidiously discriminatory commercial speech which is not entitled to constitutional protection. ■ While we concede the Constitution affords a lesser protection to commercial speech than to other constitutionally guaranteed expression (*Central Hudson Gas & Elec.* v. *Public Serv. Comm'n* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343]), speech is not rendered commercial by the mere fact that it relates to an advertisement. (*Pittsburgh Press Co.* v. *Human Rel. Comm'n* (1973) 413 U.S. 376, 384 [37 L.Ed.2d 669, 676, 93 S.Ct. 2553].) A publication is not a commercial advertisement if it " 'communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial sup-

port on behalf of a movement whose existence and objectives are matters of the highest public interest and concern.'" (At p. 385 [37 L.Ed.2d at p. 677]; quoting from *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 266 [11 L.Ed.2d 686, 698, 84 S.Ct. 710, 95 A.L.R.2d 1412].) Thus, appellants' views, as opposed to its discriminatory practices,[12] are entitled to protection under the free speech guarantees of the California and United States Constitutions.

1. *Paragraph 2 violates the protection of "sentiments" guaranteed by article I section 2, subdivision (a) of the California Constitution.*

Article I section 2, subdivision (a) of the California Constitution is more definitive and inclusive than its federal counterpart. (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116].) The section guarantees: "Every person may freely speak, write and publish his or her *sentiments* on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Italics added.)

Analysis of the section shows that it is comprised of three subparts: (1) an affirmation that all persons may freely speak, write and publish their "sentiments," (2) a provision allowing for liability once that right is abused and (3) a prohibition against laws which infringe freedom of speech or the press. Only the third subpart is paralleled, more or less, in the federal Constitution ("Congress shall make no law . . . abridging the freedom of speech, or of the press . . ."). (See Comment, *Rediscovering the California Declaration of Rights* (1974) 26 Hastings L.J. 481, 493.)

■ The first subpart of the section, "[e]very person may freely speak, write and publish his or her sentiments on all subjects," is qualified only by the second subpart which provides for responsibility *after the fact* if that right is abused. Although the section does not use the term "prior restraint," the plain meaning of the first sentence of article I section 2, subdivision (a) is that "sentiments" are protected from any prepublication sanctions, i.e., from all prior restraints. (*Dailey* v. *Superior Court* (1896) 112 Cal. 94, 100 [44 P. 458].)

The California Supreme Court's seminal opinion on the meaning of article I, section 2, subdivision (a) was rendered in 1896 in *Dailey* v. *Superior Court, supra,* 112 Cal. 94. *Dailey* concerned a play entitled "The Crime of a Century" which was being advertised by posters and newspapers in San Francisco. The play was assertedly based on the facts of a notorious murder for which the accused was soon to be tried in San Francisco. On complaint of the accused alleging that production of the play would deprive him of a

---

[12]The trial court found that appellants' activities in connection with the CYP "was secular commercial conduct . . . performed for profit."

fair trial, the trial court issued an order prohibiting further production or advertising. The Supreme Court reversed the trial court, concluding that "the order made by the trial court was an attempted restraint upon the right of free speech, as guaranteed by the constitution of this state . . . ." (*Id.,* at p. 100.) The Supreme Court's discussion of what is now section 2, subdivision (a) of article I is instructive: "The wording of this section is terse and vigorous, and its meaning so plain that construction is not needed. The right of the citizen to freely speak, write, and publish his sentiments is unlimited, but he is responsible at the hands of the law for an abuse of that right. He shall have no censor over him to whom he must apply for permission to speak, write, or publish, but he shall be held accountable to the law for what he speaks, what he writes, and what he publishes. It is patent that this right to speak, write, and publish cannot be abused until it is exercised, and before it is exercised there can be no responsibility. The purpose of this provision of the constitution was the abolishment of censorship, and for courts to act as censors is directly violative of that purpose. This provision of the constitution as to freedom of speech varies somewhat from that of the constitution of the United States, and many state constitutions treating of this question; but, if there is a material difference in the various provisions, it works no harm to this petitioner, for the provision here considered is the broader, and gives him greater liberty in the exercise of the right granted." (*Id.,* at pp. 97-98.)

In *Wilson* v. *Superior Court, supra,* 13 Cal.3d 651, a decision which interpreted federal constitutional law, the Supreme Court stated that its interpretation of section 2, subdivision (a) of article I of the California Constitution "is exemplified" by *Dailey* and referred to that "protective provision" as one "more definitive and inclusive than the First Amendment." (*Id.,* at p. 658.)[13]

What then is the scope of the guarantee of the first sentence of article I, section 2, subdivision (a), which protects "sentiments" from prepublication sanctions? Its scope must depend on the meaning of the term "sentiments." In Webster's New World Dictionary (1976), "sentiment" is defined as "1. a complex combination of feelings and *opinions* 2. an *opinion,* etc., often colored by emotion 3. appeal to the emotions, or sensitivity to this 4. maudlin emotion." (*Id.,* at p. 542, italics added.) In *Guglielmi* v. *Spelling-Goldberg Productions* (1979) 25 Cal.3d 860 [160 Cal.Rptr. 352, 603 P.2d 454], the Supreme Court observed: "It is noteworthy that the California Constitution provides that '[e]very person may freely speak, write and publish his

---

[13]*Wilson* v. *Superior Court, supra,* 13 Cal.3d 651, invalidated a prior restraint under both the federal and state Constitutions but, apart from a brief paragraph mentioning *Dailey,* it rested its analysis on federal case law. (See discussion, *infra.*)

or her sentiments on all subjects . . . .' (Art. I, § 2.) As Webster confirms, 'sentiments' encompasses not only thoughts but the attendant emotions. [Citation.]" (*Id.*, at p. 867, fn. 8.) Thus, it is plain that the "sentiments" to which article I, section 2, subdivision (a) refers include statements of editorial thought, emotion and opinion. Therefore, consistent with that provision, in this state statements of editorial opinion may not be restrained prior to publication.

Here, however, the purpose and effect of paragraph 2 of the trial court's injunction is precisely that—to restrain appellants' statements of editorial opinion—as it forbids appellants from stating they have a religious purpose in publishing the CYP, from expressing their views as to what kind of treatment consumers should expect from "Christian business people," and from offering their editorial opinion on the question " 'Who is a Christian?' " Therefore, paragraph 2 of the trial court's order cannot be reconciled with the plain meaning of article I, section 2, subdivision (a) of the California Constitution and for that reason it must be stricken.

*2. Paragraph 2 is invalid as a prior restraint on speech under the First Amendment.*

Any restraint on expression prior to publication bears " 'a heavy presumption against its constitutional validity' " under the First Amendment. (*New York Times Co.* v. *United States* (1971) 403 U.S. 713, 714 [29 L.Ed.2d 822, 824, 91 S.Ct. 2140]; *Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58, 70 [9 L.Ed.2d 584, 593, 83 S.Ct. 631].)

Prior restraints have been viewed as offensive to the First Amendment since the United States Supreme Court's landmark decision in *Near* v. *Minnesota* (1931) 283 U.S. 697 [75 L.Ed. 1357, 51 S.Ct. 625]. In *Near,* state law made it unlawful to publish a " 'malicious, scandalous and defamatory newspaper, magazine or other periodical' " and empowered state courts to enjoin the publication of such papers. (At pp. 701-702 [75 L.Ed. at p. 1360].) Near published a weekly newspaper containing articles relating to public officials and others which was virulently antisemitic. (At p. 724, fn. 1 [75 L.Ed. at p. 1372] (dis. opn. of Butler, J.).) An action was brought and, after trial, the state court permanently enjoined Near and his codefendants " 'from producing, editing, publishing, circulating, having in their possession, selling or giving away any publication whatsoever which is a malicious, scandalous or defamatory newspaper, as defined by law,' and also 'from further conducting said nuisance under the name and title of said The Saturday Press or any other name or title.' " (At p. 706 [75 L.Ed. at p. 1362].) The Supreme Court reversed. Chief Justice Hughes noted the history of prior restraints both in this country and in England and, drawing

on the commentaries of Blackstone and Justice Story, stated in his opinion that in determining the extent of the First Amendment's protection, "it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication." (At p. 713, see p. 714 [75 L.Ed. at p. 1366].)

Subsequent cases have followed *Near* in refusing to validate court-ordered prior restraints on publication. Thus, in *New York Times* v. *United States, supra,* 403 U.S. 713, the court held that no prior restraint could issue to prevent publication of the Pentagon Papers, despite a claim that national security would probably be jeopardized. In *Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539 [49 L.Ed.2d 683, 96 S.Ct. 2791], the Supreme Court reversed a trial court order restraining the news media from publishing or broadcasting accounts of the accused's confessions or admissions or facts strongly implicating him, where there was no showing that alternatives to a prior restraint on the news media would not have sufficiently mitigated the adverse effects of pretrial publicity. (Cf. *Dailey* v. *Superior Court, supra,* 112 Cal. 94.) And, in *Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415 [29 L.Ed.2d 1, 91 S.Ct. 1575], the Supreme Court reversed an injunction prohibiting the distribution of leaflets attacking the policies of a real estate broker, holding it was an unconstitutional prior restraint.

In *Wilson* v. *Superior Court, supra,* 13 Cal.3d 652, a candidate had distributed a newsletter which contained reprints of newspaper articles showing his incumbent opponent had been indicted for various crimes. The newsletter did not reveal that the indictment was six years old nor that the incumbent had been acquitted. The incumbent brought an action to restrain further publication of the newsletter and the trial court issued an injunction to that effect. The California Supreme Court unanimously ruled that the injunction was unconstitutional. The harms sought to be prevented by the injunction were grave—they included not only defamatory material but were injurious to the electoral process. However, the *Wilson* court noted, "[t]he cases establish that 'the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished.' [Citation.] . . . [I]f publication of the Pentagon Papers did not constitute a sufficiently serious threat to justify creation of an exception to the established principles [of the prior restraint doctrine], the circulation of election campaign charges, even if deemed extravagant or misleading, does not present a danger of sufficient magnitude to warrant a prior restraint." (*Id.,* at p. 660.)[14]

---

[14]Both *Organization for a Better Austin, supra,* 402 U.S. 415, and *Wilson* v. *Superior Court, supra,* 13 Cal.3d 652, suggest that prior restraints may be permissible where they otherwise would not be if they are aimed at "private" wrongs. (402 U.S. 415, 418-419 [29 L.Ed.2d 1, 5]; 13 Cal.3d at p. 662.) Although in this case, Pines and Aronek are private parties, the B'nai B'rith joined in the action as a private attorney general. Further, the

Respondents urge, however, that publication of the "Christian Yellow Pages Concept" is both discriminatory business conduct by itself and also that it "aids" and "incites" other such unlawful conduct in violation of Civil Code section 52, subdivision (a), and the trial court has so found. That argument does not save paragraph 2 from being stricken as a prior restraint. Peaceful expressions of religious or political opinion cannot be enjoined consistent with the First Amendment.

*Collin* v. *Smith* (7th Cir. 1978) 578 F.2d 1197, cert. den., 439 U.S. 916 [58 L.Ed.2d 264, 99 S.Ct. 291], is instructive. There the courts were asked to prevent prior restraint of a march which the American Nazi Party was seeking to hold in the predominantly Jewish suburb of Skokie, Illinois. The Seventh Circuit upheld the Nazi's right to march, holding that the denial of a forum in advance of actual expression is a prior restraint which violates the First Amendment. (*Id.*, at p. 1207.) The court stated with regard to government control of the content of First Amendment activity: "'[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content. [Citations.] To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." [Citations.]'" (*Id.*, at p. 1202.)

The court noted that content regulation is not per se invalid. There are established exceptions to the rule, "namely, obscenity, fighting words, and as limited by constitutional requirements, libel." (*Id.*, at p. 1202.) Likewise, in very narrow circumstances, a government may proscribe content on the basis of imminent danger of a grave substantial evil. (*Ibid.*; see *Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 447 [23 L.Ed. 430, 433, 89 S.Ct. 1827].) In *Brandenburg, supra,* 395 U.S. 444, 447 [23 L.Ed.2d 430, 434], the Supreme Court stated, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe [even] advocacy of the use of force or of law violation *except* where such advocacy

---

"public" nature of the wrongs involved is apparent, inter alia, from the facts that the Attorney General or any district attorney or city attorney is empowered to bring an injunctive action for violations of the Unruh Act (Civ. Code, §§ 51, 51.5) under Civil Code section 52, subdivision (c), and the Attorney General or any other public prosecutor, and any person or association "acting for the interest of itself, its members or the general public" may bring an action under Business and Professions Code section 17204 to enjoin violations of Business and Professions Code section 17200.

is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." (Italics added.)

In the instant case, respondents have asserted only that appellants' publication "aids" or "incites" others to discriminate on the basis of religion. That contention does not bring this case within one of the exceptions to the First Amendment prohibition against government control of protected expression.

Moreover, as appellants have pointed out, the CYP advertisers and readers also have protected First Amendment rights. In *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 756-757 [48 L.Ed.2d 346, 355, 96 S.Ct. 1817], the Supreme Court succinctly stated the principle as follows: "[T]he protection afforded is to the communication, to its source and to its recipients both . . . [T]his Court has referred to a First Amendment right to 'receive information and ideas,' and that freedom of speech ' "necessarily protects the right to receive." ' "

Here, there is no justification for overcoming the presumption that a prior restraint is invalid. Eradication of invidious religious discrimination in business is unquestionably a vital governmental objective. However, the manifestation of that evil—appellants' unlawful business practice of refusing to deal with those who are not, or who will not affirm they are, "born-again" Christians—is sufficiently circumscribed by paragraph 1 of the trial court's injunctive order. Unlike paragraph 1, paragraph 2, which prohibits appellants from publishing their opinions, does not respond precisely to that harm. "[A] free society prefers to punish the few who abuse the rights of speech *after* they break the law than to throttle them and all others beforehand." (*Southeastern Promotions, Ltd.* v. *Conrad* (1975) 420 U.S. 546, 559 [43 L.Ed.2d 448, 459, 95 S.Ct. 1239]; italics in original.)

## II. C.

*Paragraph 3 of the trial court's injunction is unnecessary to the judgment and should be stricken.*

Paragraph 3 of the trial court's injunction orders that appellants not "[1] Publish advertisements or material of any kind whatsoever . . . which requires direct or indirect identification of an advertiser's or lister's religious affiliation . . . [2] except that advertisers or listers may identify themselves as Christians or use Christian logos or symbols."

Paragraph 1 of the trial court's injunction, which we have upheld, prohibits appellants' discriminatory business practice of requiring an oath or

affirmation of a particular religious belief as a precondition to placing an advertisement in the CYP. While paragraph 1 is in force, if appellants were to publish advertisements or material of any kind which require a lister or advertiser to identify his religious affiliation, it would be punishable as contempt. Therefore, the first portion of paragraph 3 is unnecessary to the judgment.

The second portion of paragraph 3, which provides that advertisers or listers may identify themselves as Christians by words or symbols, adds nothing to their rights under the First Amendment. Thus, it is also unnecessary to the judgment.

We conclude, therefore, that paragraph 3 should be stricken from the trial court's injunctive order as unnecessary to the protection of respondents' First Amendment freedoms.

## III.

*Paragraph 1 of the trial court's injunction, as modified, is not void for vagueness or overbreadth.*

Appellants contend that paragraph 1 of the trial court's injunction must be reversed as void for vagueness and overbreadth.[15]

They posit that the last sentence of paragraph 1 is unintelligible. We agree and modify the trial court's injunctive order by striking therefrom the third word of the sentence so that the sentence now reads: "The foregoing [] shall be deemed to include a prohibition against the exclusion from advertisements or listings based upon the existence or non-existence of any personal religious experience, including the experience described as 'born-again' Christianity." As thus modified the sentence correctly reflects the intent of the trial court.

Appellants next contend that paragraph 1 of the trial court's order is overbroad in that it applies to "all of the defendants' . . . publications, *in or outside of California.*" (Italics added.) They assert the trial court lacks jurisdiction to enjoin their publications outside this state. Appellants' contention lacks merit.  ■  " '[I]n accordance with the general rule, . . . that a court of equity having jurisdiction of the person of defendant may render any appropriate decree acting directly on the person, even though the sub-

---

[15]Appellants' contentions of overbreadth and vagueness in regard to paragraphs 2 and 3 of the trial court's order are moot since we have determined those paragraphs must be stricken from the trial court's order.

ject matter affected is outside the jurisdiction, a court having jurisdiction of the parties may grant and enforce an injunction, although the subject matter affected is beyond its territorial jurisdiction, or requires defendant to do or refrain from doing anything beyond its territorial jurisdiction which it could require him to do or refrain from doing within the jurisdiction.' [Citations.]" (*Allied Artists Pictures Corp.* v. *Friedman* (1977) 68 Cal.App.3d 127, 137 [137 Cal.Rptr. 94].)

## IV.

*Respondents are entitled to attorneys' fees on appeal.*

Respondents have requested an award of attorneys' fees on appeal pursuant to the provisions of Business and Professions Code section 16750 and Civil Code section 52. We have concluded that the reasonable value of the services of respondents' attorneys on the appeal should be fixed and awarded by the trial court. (See *Hypolite* v. *Carleson* (1975) 52 Cal.App.3d 566, 589 [125 Cal.Rptr. 221]; *Horn* v. *Swoap* (1974) 41 Cal.App.3d 375, 384 [116 Cal.Rptr. 113]; see *Le Blanc* v. *Swoap* (1976) 16 Cal.3d 741, 743 [129 Cal.Rptr. 304, 548 P.2d 704]; 4 Witkin, Cal. Procedure (2d ed. 1983 supp.) § 134B, p. 293.)

## CONCLUSION

Oliver Wendell Holmes once remarked, "I long have said that there is no such thing as a hard case. I am frightened weekly, but always when you walk up to the lion and lay hold the hide comes off and the same old donkey of a question of law is underneath."[16]

We have been charged in this case with the burden of judicially distinguishing between difficult and opposing views in a field of substantial uncertainty. Our perceived duty has been to narrow the exercise of purported power of one clashing adversary over the rights of an opponent. In that light, we have cautiously reviewed any attempted encroachment over another's will or desire.

As the end of the law is peace, we have sought in our resolution to extend a saving hand to this occasion's call by allowing no preferred treatment nor unnecessary relegation of any party to a deferent position.

We have advanced an interpretation of fact and law which results in a standard of what is deemed reasonable and right and fashions a path for greater harmony in the human community.

---

[16] 1 Holmes—Pollock Letters 156.

While we cannot, except by case-by-case analysis, dictate the morals of the marketplace, we can pronounce that acts of discrimination, practiced ingeniously or ingenuously, cannot stand in this hallowed hall where the injured apply for justice.

We wish to stress that the reversal of paragraphs 2 and 3 of the trial court's injunction will not strip the judgment of its vitality. Nothing in the doctrine of prior restraints prohibits legal sanctions from being taken against those who violate a lawful court order. Paragraph 1 of the injunction, which prohibits appellants' *acts* of discrimination on the basis of religion, will sufficiently protect respondents' First Amendment rights.

### DISPOSITION

That portion of the judgment which awards Pines and Aronek damages and paragraph 1 of the trial court's injunctive order, as modified by striking therefrom the third word of the last sentence of paragraph 1, are affirmed. Paragraphs 2 and 3 of the trial court's injunctive order are stricken and those portions of the judgment are reversed. The matter is remanded to the trial court, which is directed to hear respondents' application for attorneys fees for services rendered on this appeal and to allow and fix the reasonable value of those fees. The parties are to bear their own costs on appeal.

Klein, P. J., and Danielson, J., concurred.

On October 16, 1984, the opinion was modified to read as printed above.