[No. B065422. Second Dist., Div. Seven. Jan. 28, 1993.]

PHILIP A. HART, Plaintiff and Appellant, v.
CULT AWARENESS NETWORK et al., Defendants and Respondents.

## COUNSEL

Bowles & Moxon, Randall A. Spencer, Turner, Gerstenfeld, Wilk, Tigerman, Heller & Young and Lawrence E. Heller for Plaintiff and Appellant.

Hagenbaugh & Murphy, Peter M. Schnirch and Daniel A. Leipold for Defendants and Respondents.

## OPINION

**LILLIE, P. J.**—Plaintiff, a member of the Church of Scientology, appeals from an order denying a preliminary injunction against defendants to "cease refusing membership in the Cult Awareness Network, and the Cult Awareness Network, Los Angeles Chapter [CAN-LA], to plaintiff and members of the Scientology religion or minority religious organizations," on the ground that such exclusion violated the Unruh Civil Rights Act, Civil Code section 51.[1] The issue before us is whether the trial court properly determined that it is not reasonably probable that plaintiff will succeed in demonstrating that CAN-LA[2] is a business establishment within the meaning of Civil Code section 51.

---

[1]Civil Code section 51 provides in pertinent part: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or other physical disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

[2]The preliminary injunction was sought against four defendants: (1) Cult Awareness Network (CAN or CAN-National), a national organization; (2) Cynthia Kisser, CAN's national director; (3) CAN-LA, a local affiliate of CAN; and (4) Priscilla Coates, chairwoman

FACTUAL AND PROCEDURAL BACKGROUND

The following facts are gleaned from evidence found to be admissible by the trial court, the evidentiary rulings of which are not challenged on appeal.

CAN-National is a nonprofit corporation; its purpose is to educate the public about the harmful effects of mind control as practiced by destructive cults and about the unethical or illegal practices they employ. CAN-National collects information and conducts research on numerous cults, which information is available for a fee covering copying and mailing costs; it also maintains a confidential hotline to give immediate help or information to persons involved with destructive cults, their family or friends, or anyone seeking more information on the cult issue.

Membership in CAN-National is open to individuals without regard to race, religion or national origin. Payment of an annual fee, currently $30, entitles members to receipt of the monthly CAN Newsletter and notice of yearly CAN meetings, to which all members will be admitted unless and until the determination is reasonably made that they are planning or engaging in activity disruptive to the meeting or detrimental to its purpose or the well-being of other members. Although plaintiff has never requested status as a member of CAN-National or tendered payment of the annual fee, were he to do so, he would be admitted to membership status in CAN-National and afforded the benefits of such membership—the monthly newsletter and notice of CAN-National yearly meetings.

The September 1991 issue of the Business Link, a publication of the Better Business Bureau serving Southern California, contained an article exposing Sterling Management Systems, a Glendale, California, consulting and training business, as "but one of many of the Scientology cult's front groups," and listed a dozen other organizations which also were alleged front groups for the Church of Scientology. The publication also offered some characteristics of cults as discouraging family life and normal childhood behavior, isolating children and requiring them "to participate in endless rituals, excessive meditation or to work at tasks inappropriate for their age. Diets are often restricted. Discipline may be excessive." The same issue also highlighted the work of CAN-National and stated that it maintains extensive information files on the Church of Scientology.

of CAN-LA. As to the national organization, the trial court "accepted the contention and representation of defendants that the application for preliminary injunction as to membership by plaintiff in CAN-National is moot because plaintiff will promptly be granted membership in that organization upon his satisfaction of reasonable conditions of membership." As appellant does not challenge the foregoing portion of the order as to CAN-National, we deem this appeal to relate only to CAN-LA.

CAN-LA is an unincorporated association separate from, but authorized to exist by, CAN-National's requirements for affiliation. These requirements include the existence of five or more unrelated persons wishing to form an affiliate organization, agreement to hold at least four meetings per year, agreement to subscribe to the by-laws of CAN-National, payment of $100 annual affiliate dues; and submission of quarterly activity reports and yearly financial reports to CAN-National. With the exception of providing CAN brochures for CAN-LA to use in providing information to interested persons, CAN-National provides no financial support to CAN-LA.

Priscilla Coates is the chairwoman of CAN-LA; she receives no salary as chairwoman; CAN-LA has no paid employees and owns no tangible assets of any kind; the only revenue generated by CAN-LA comes in the form of donations and the entire "work force" consists of volunteers who donate time and resources to the organization.

Until October 1991, meetings of CAN-LA were held on a bimonthly basis in a room provided free of charge by a local bank or in the home of Coates; currently, meetings are held on an irregular basis at the homes of members or friends of the organization. CAN-LA sells no products or services of any kind; as director, Coates is called upon to provide information to interested persons, which she does free of charge, except for reimbursement of copying costs where applicable. Coates and other members of CAN-LA are sometimes called upon to speak at various events; they charge no fee for such service, but occasionally accept modest honoraria in the $50 range. CAN-LA has no involvement in lobbying either the state or federal legislatures for new laws concerning religious issues.

Beginning in July 1991, Coates began to receive a total of 486 letters from acknowledged Scientologists requesting to be admitted as members of CAN-LA, purportedly to engage in religious dialogue with other members; the letters were remarkably similar in composition. Coates believed the campaign of letters from Scientologists professing their desire to join CAN-LA was designed as a harassment measure against CAN and CAN-LA, as in February 1991, the Church of Scientology identified CAN as a suppressive group, which church literature defines as "one that actively seeks to suppress or damage Scientology or a Scientologist by Suppressive Acts." According to church literature, a suppressive person or group becomes "fair game," and a person or group which is fair game "May be deprived of property or injured by any means by any Scientologist without any discipline of the Scientologist. May be tricked, sued or lied to or destroyed." A February 1991 Church of Scientology document relating to two individuals not parties to this action stated that one of the individuals "has associated herself with

the Cult Awareness Network, a small antireligious group which is connected to and works for the Internal Revenue Service. Past and recent leaders of the Cult Awareness Network have included convicted kidnappers and sex criminals. At the behest of these suppressive associates, Adeline and Fred attempted to covertly infiltrate a meeting of church members and pass on information . . . to a reporter of the Los Angeles Times in an effort to support its unsuccessful attempts to attack Scientology."

On August 8, 1991, plaintiff sent a letter to CAN-LA informing it that he was a Scientologist and requesting membership in CAN-LA; Coates informed plaintiff that his letter had been forwarded to CAN for consideration; in October 1991, plaintiff spoke again to Coates, who told him that he would not be allowed to join CAN-LA because of his membership in the Church of Scientology.

According to plaintiff's declaration submitted in support of his application for preliminary injunction, "I wanted to and still want to join CAN-LA, for the purpose of engaging in a meaningful religious dialogue with the members of CAN-LA about the merits of underlying philosophies of their respective religions, including providing a Scientologist's perspective of Scientology. . . . I have become aware that, despite its stated purposes, CAN has engaged in an extensive campaign to destroy my religion and others. I am also aware that CAN is required by its own statement of purpose, and by its status as a tax-exempt educational organization, to hear and be informed on all sides of religious issues. Thus, I am seeking to exercise my right to join this organization and voice my side of the story of Scientology, to bring about an understanding which would urge this organization to understand and entertain positive viewpoint toward Scientology, and to compel CAN to cease its attacks on my religion. It never was, nor is it my intention to disrupt or interfere with the activities of CAN-LA in any manner whatsoever."

Coates personally feared "the retributive nature of the Church of Scientology's Fair Game practice and [has] endorsed the denial of CAN membership to plaintiff Hart solely on that basis." Although plaintiff was denied membership in CAN-LA, Coates "could and would arrange for him to speak to a gathering of CAN-LA members and/or friends at his request."

In January 1992, plaintiff filed an amended complaint for damages and preliminary and permanent injunction for religious discrimination in violation of the Unruh Civil Rights Act, and also filed application for preliminary injunction. Defendants opposed the application. After hearing, the court took the matter under submission. By minute order of February 28, 1992, the trial

court issued a scholarly eight-page ruling denying plaintiff's application for preliminary injunction on the grounds that plaintiff did not demonstrate a reasonable probability he would succeed in showing that CAN-LA is a business establishment within the meaning of Civil Code section 51 and that plaintiff did not demonstrate that the balance of hardships favored him. Plaintiff timely filed notice of appeal from the order denying his application for preliminary injunction.

I

STANDARD OF REVIEW

■ " '[T]rial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued.' " (*Ketchens* v. *Reiner* (1987) 194 Cal.App.3d 470, 474 [239 Cal.Rptr. 549].) The decision to deny a preliminary injunction is upheld on appeal if the reviewing court determines discretion was properly exercised with respect to either the question of likelihood of success on the merits or the question of irreparable harm. (*Sundance Saloon, Inc.* v. *City of San Diego* (1989) 213 Cal.App.3d 807, 811-812 [261 Cal.Rptr. 841].)

The scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an abuse of discretion. (*Conservatorship of Hart* (1991) 228 Cal.App.3d 1244, 1253 [279 Cal.Rptr. 249].)

■ As the evidence before the trial court on the application for preliminary injunction was essentially undisputed, it is a matter of law whether, on that evidentiary record, Hart demonstrated that CAN-LA is a business establishment within the Unruh Civil Rights Act. Inasmuch as we conclude that Hart has not demonstrated that CAN-LA is such a business establishment, the trial court did not abuse its discretion in denying the application for preliminary injunction on the ground that Hart was not reasonably likely to succeed on the merits.[3] Accordingly, we need not address the issue of interim hardship.

---

[3]Although the granting or denying of a preliminary injunction does not constitute an adjudication of the ultimate rights in controversy (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840]), in some cases an appeal from such an

## II

## "Business Establishments" Under the Unruh Civil Rights Act

■ "The Legislature used the words 'all' and 'of every kind whatsoever' in referring to business establishments covered by the Unruh [Civil Rights] Act (Civ. Code, § 51), and the inclusion of these words, without any exception and without specification of particular kinds of enterprises, leaves no doubt that the term 'business establishments' was used in the broadest sense reasonably possible. The word 'business' embraces everything about which one can be employed, and it is often synonymous with 'calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain.' [Citations.] The word 'establishment,' as broadly defined, includes not only a fixed location, such as the 'place where one is permanently fixed for residence or business,' but also a permanent 'commercial force or organization' or 'a permanent settled position (as in life or business).' " (*Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463, 468-469 [20 Cal.Rptr. 609, 370 P.2d 313].)

■ An organization is not excluded from the scope of Civil Code section 51 simply because it is nonprofit. (*O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790, 796 [191 Cal.Rptr. 320, 662 P.2d 427].) However, "the statute does not govern relationships which are truly private— . . . those which are 'continuous, personal, and social' [citation] and take place more or less outside 'public view.' [Citation.] 'Private' groups and institutions do not fall prey to the Act simply because they operate 'nongratuitous' residential or recreational facilities for their members or participants; an 'accommodation' must be 'public' to be covered. Conversely, we have stressed that the statute was intended to include those kinds of recreational *facilities* traditionally deemed 'accommodations.' We have not suggested

order will necessarily decide a dispositive rule of law. Thus, some cases state that when the issue " 'is solely a question of a violation of law the standard of review is not abuse of discretion but whether statutory or constitutional law was correctly interpreted and applied by the trial court.' " (*Bullock* v. *City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1094 [271 Cal.Rptr. 44].) This is so because occasionally " 'the likelihood of prevailing on the merits depends upon a question of pure law rather than upon evidence to be introduced at a subsequent full trial. . . . If such a question of pure law is presented, it can sometimes be determinative over the other factor, for example, when the defendant shows that the plaintiff's interpretation is wrong as a matter of law and thus the plaintiff has no possibility of success on the merits.' " (*Id.* at p. 1095.)

In this case, our resolution of the issue of whether CAN-LA is a business establishment within the meaning of Civil Code section 51 is based on evidence of the nature and activities of CAN-LA admitted by the trial court at the hearing on the application for preliminary injunction. This evidence, though undisputed, may not represent all of the evidence, or may be different than the evidence introduced after a full trial. Accordingly, although the issue before us is one of law, our conclusion on that issue is based on our record and we do not purport to adjudicate the merits of the controversy as though the case had proceeded to trial.

that noncommercial groups which do not operate such facilities are covered 'business establishments.' " (*Isbister* v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 84, fn. 14 [219 Cal.Rptr. 150, 707 P.2d 212], original italics.)

▋ Respondents claim that a construction of the Unruh Civil Rights Act to bring CAN-LA within the meaning of "business establishment" would constitute an infringement of the members' rights of freedom of association in that admitting into CAN-LA "members of a group like Scientology, which does fit the category of a cult, . . . would most likely lead to CAN-LA's ultimate destruction." As we must construe the statute " 'so that "constitutional difficulties" will not even arise' " (*Curran* v. *Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712, 731 [195 Cal.Rptr. 325, 38 A.L.R.4th 607]), we must necessarily examine the effect of applying the Unruh Civil Rights Act to CAN-LA and its members' constitutionally protected freedom of association. Then, the " 'character and extent of any interference with the freedom of association must be weighed against the countervailing interests.' " (*Id.* at p. 730.)

### III

### CAN-LA's Associational Rights

▋ "As we observed in [*Roberts* v. *United States Jaycees* (1984) 468 U.S. 609 (82 L.Ed.2d 462, 104 S.Ct. 3244)], our cases have afforded constitutional protection to freedom of association in two distinct senses. First, the Court has held that the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the Court has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities. In many cases, government interference with one form of protected association will also burden the other form of association." (*Bd. of Dirs. of Rotary Int'l* v. *Rotary Club* (1987) 481 U.S. 537, 544 [95 L.Ed.2d 474, 483-484, 107 S.Ct. 1940].)

### A. *Freedom of Private Association*

"The Court has recognized that the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights. . . . We have not attempted to mark the precise boundaries of this type of constitutional protection. The intimate relationships to which we have accorded constitutional protection include marriage, [citation]; the begetting and bearing of children, [citation]; child rearing and education [citation]; and cohabitation with relatives, [citation].

Of course, we have not held that constitutional protection is restricted to relationships among family members. ■ We have emphasized that the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.' " (*Bd. of Dirs. of Rotary Int'l* v. *Rotary Club, supra*, 481 U.S. 537, 545 [95 L.Ed.2d 474, 484, 107 S.Ct. 1940].) "Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection. . . . [¶] Between these poles, of course, lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments. . . . We note only that factors that may be relevant include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." (*Roberts* v. *United States Jaycees, supra*, 468 U.S. 609, 620 [82 L.Ed.2d 462, 473].)

■ The evidence indicates that the relationship among CAN-LA members is the type of intimate and private relationship that warrants constitutional protection. CAN-LA is not a "large and basically unselective" group, as were the local chapters of the Jaycees in *Roberts*. (*Roberts* v. *United States Jaycees, supra*, 468 U.S. at p. 621 [82 L.Ed.2d at p. 473].) In fact, according to CAN-LA's bylaws of August 1991, membership is only open to "families and former members of destructive groups and others committed to exposing these groups." Membership in CAN-LA must be approved by the membership committee, and individuals who are not members of CAN-LA will be permitted to attend meetings at the discretion of the officers (chairman, vice-chairman, secretary, treasurer, and FOCUS coordinator). The lack of any other guidelines for membership specified in the bylaws indicates that membership is largely discretionary with the membership committee. A written membership application requires prospective members to list three references, to explain in detail their interest in CAN membership, and to adopt in writing a statement that "I am not now a member of a destructive group . . . ," and that "I will promote the principles of CAN-National and CAN-LA. I will not use any information I learn to harm CAN-National or CAN-LA or its members."

Accordingly, CAN-LA is a "well-defined subgroup" (*Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d at p. 89), whose membership is

highly restricted and selective, based on shared opinions, thoughts and concerns with respect to "destructive cults." This type of group is to be contrasted to the Rotary Club, whose purpose " 'is to produce an inclusive, not exclusive, membership, making possible the recognition of all useful local occupations, and enabling the club to be a true cross section of the business and professional life of the community.' " (*Bd. of Dirs. of Rotary Int'l* v. *Rotary Club, supra*, 481 U.S. at p. 546 [95 L.Ed.2d at p. 485].) CAN-LA is also distinguishable from the Boys' Club in *Isbister*, which offered basic recreational facilities to a broad segment of the population and admitted "without distinction fully half the youthful population of Santa Cruz [i.e., boys]. The sole group excluded [girls], though not numerically a minority, has been a traditional target of discrimination." (*Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d at p. 89.)

It can be inferred from our record that CAN-LA carefully inquires into the background of its prospective members and examines their reasons for wanting to join. CAN-LA is thus to be distinguished from the Jaycees in *Roberts*, where "new members are routinely recruited and admitted with no inquiry into their backgrounds." (*Roberts* v. *United States Jaycees, supra*, 468 U.S. 609, 621 [82 L.Ed.2d 462, 473].)

*Roberts* is also distinguishable from the instant case by the nature of the activities carried out by the Jaycees. In *Roberts*, the United States Supreme Court upheld the Minnesota Supreme Court's determination that the Jaycees is a place of public accommodation under that state's Human Rights Act in that it is a public business, selling goods and extending privileges in exchange for membership dues, and soliciting and recruiting members on unselective criteria. (468 U.S. at p. 616 [82 L.Ed.2d at p. 470].) Unlike the Jaycees, CAN-LA does not offer any goods and services to the general public; rather, it counsels and provides support to its very selective membership and its members may also choose to speak at certain events.

Thus, on the "broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State," (*Roberts* v. *United States Jaycees, supra*, 468 U.S. at p. 620 [82 L.Ed.2d at p. 473]), the relationship between the members of CAN-LA, objectively assessed, primarily involves the intimate personal concerns and activities deserving of a high level of constitutional protection. Accordingly, CAN-LA possesses the distinctive characteristics which entitle its membership decisions to constitutional protection. ■ Application of the Unruh Civil Rights Act to CAN-LA in this case would thus infringe upon its members' rights of private association.

## B. *Freedom of Expressive Association*

"An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward these ends were not also guaranteed. [Citation.] According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority. [Citations.] ■ Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." (*Roberts* v. *United States Jaycees*, *supra*, 468 U.S. 609, 622 [82 L.Ed.2d 462, 474].) "There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together. Freedom of association therefore plainly presupposes a freedom not to associate." (*Id.* at p. 623 [82 L.Ed.2d at pp. 474-475].) The court in *Roberts* concluded that the Minnesota act which required the Jaycees to admit women as full voting members worked an infringement of the right to associate for expressive purposes. (*Ibid.*) ■ Accordingly, under the *Roberts* analysis, application of the Unruh Civil Rights Act to CAN-LA clearly would work an infringement of its members' right to associate for expressive purposes. (See also *Democratic Party of U.S.* v. *Wisconsin* (1981) 450 U.S. 107, 122 [67 L.Ed.2d 82, 95, 101 S.Ct. 1010], [recognizing right of political parties to protect themselves from intrusion by those with adverse political principles].)

Unlike the situation in *Roberts*, there is a substantial basis in our record to support the conclusion that admitting appellant as well as other Scientologists as members of CAN-LA will impede its ability to engage in protected activities and to disseminate its preferred views. Appellant plainly admits that his purpose is to inform CAN-LA about Scientology so as to challenge, if not change, CAN-LA's belief that Scientology is a destructive cult. This purpose is incompatible with CAN-LA's work in counseling and providing support for ex-cult followers and the families of current cult followers.

We conclude that application of the Unruh Civil Rights Act in this case would place a heavy burden on both types of CAN-LA's constitutionally protected freedom of association under the federal and California Constitutions. The California Constitution "affords greater privacy, expressive, and associational rights in some cases than its federal counterpart." (*Isbister* v. *Boys' Club of Santa Cruz, Inc.*, *supra*, 40 Cal.3d at p. 85.)

## IV

## NO COMPELLING STATE INTEREST JUSTIFIES APPLICATION OF THE UNRUH CIVIL RIGHTS ACT

■ "The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." (*Roberts* v. *United States Jaycees, supra,* 468 U.S. at p. 623 [82 L.Ed.2d at p. 475].)

■ Appellant has not identified any compelling state interest unrelated to the suppression of ideas that justifies application of the Unruh Civil Rights Act to CAN-LA in this case. Without support by any pertinent authority is his argument that "any privacy rights of the members of CAN-LA are outweighed by California's compelling interest in eradicating religious discrimination so that all persons may be judged solely on their individual merits." Appellant cites no authority to support the proposition that the state has any interest, let alone a compelling interest, in the way CAN-LA chooses its members, the beliefs espoused by CAN-LA, or in the primarily private arenas in which such beliefs are espoused to the exclusion of other beliefs.

What appellant characterizes as "religious discrimination" is simply CAN-LA's expression of its own ideas and beliefs in a private and highly selective forum from which Scientologists are excluded. Under the circumstances in this case, any state involvement in compelling CAN-LA to accept Scientologists as members would be tantamount to governmental sponsorship or promotion of one group's religious beliefs at another group's expense. "And as is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational." (*Democratic Party of U.S.* v. *Wisconsin, supra,* 450 U.S. 107, 124 [67 L.Ed.2d 82, 96].)

Moreover, in light of the establishment clause of the United States Constitution and the religion clauses of the California Constitution (Cal. Const., art. I, § 4), it is difficult to postulate any state interest which would justify application of the Unruh Civil Rights Act to the circumstances of this case. ■ " 'The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to

go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. . . . Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.' " (*Sands* v. *Morongo Unified School Dist.* (1991) 53 Cal.3d 863, 870-871 [281 Cal.Rptr. 34, 809 P.2d 809], italics omitted, citing *Everson* v. *Board of Education* (1947) 330 U.S. 1, 15-16 [91 L.Ed. 711, 723, 67 S.Ct. 504, 168 A.L.R. 1392].) "Two other provisions of the state Constitution, having no counterparts in the federal charter, provide additional guarantees that religion and government shall remain separate. Section 4 of article I guarantees the '[f]ree exercise and enjoyment of religion without discrimination or preference . . . .' The Attorney General of this state has observed that '[i]t would be difficult to imagine a more sweeping statement of the principle of government impartiality in the field of religion' than that found in the 'no preference' clause (25 Ops.Cal.Atty.Gen. 316, 319 (1955)), and California courts have interpreted the clause as being more protective of the principle of separation than the federal guarantee [citation]." (53 Cal.3d at p. 883.)

■ Accordingly, because the state is prohibited from any official involvement that promotes religion (*Sands* v. *Morongo Unified School Dist.*, *supra*, 53 Cal.3d at p. 883), or that prefers one religion over another, the Unruh Civil Rights Act could not be applied under the circumstances of this case without violating the religion clauses of the California Constitution. The proper stance of government with respect to the instant case is best stated by the *Sands* court: "Ours is a religiously diverse nation. Within the vast array of Christian denominations and sects, there is a wide variety of belief and practice. Moreover, substantial segments of our population adhere to non-Christian religions or to no religion. Respect for the differing religious choices of the people of this country requires that government neither place its stamp of approval on any particular religious practice, nor appear to take a stand on any religious question. In a world frequently torn by religious factionalism and the violence tragically associated with political division along religious lines, our nation's position of governmental neutrality on religious matters stands as an illuminating example of the true meaning of freedom and tolerance." (53 Cal.3d at pp. 883-884, fn. omitted.)

We conclude that appellant has failed to identify any *state* interest, let alone one which is sufficiently countervailing or compelling, as to justify the infringements on the constitutional rights of CAN-LA which would occur were the Unruh Civil Rights Act to apply in this case.

Pursuant to our duty to construe the term "business establishments" under the Unruh Civil Rights Act in the broadest sense *reasonably* possible, which

includes the duty to avoid constitutional infirmity, we hold that CAN-LA is not a business establishment within the meaning of the act. Thus, the trial court did not abuse its discretion in determining that it was not reasonably probable that Hart would succeed on the merits at trial. Inasmuch as we uphold the latter determination of the trial court, we need not address the issue of interim harm in order to dispose of this appeal.

### DISPOSITION

The order is affirmed. Respondents are entitled to their costs on appeal.

Johnson, J., and Woods (Fred), J., concurred.

Appellant's petition for review by the Supreme court was denied April 21, 1993.