[No. E044811. Fourth Dist., Div. Two. Jan. 26, 2009.]

JANE DOE, a Minor, etc., et al., Plaintiffs and Appellants, v.
CALIFORNIA LUTHERAN HIGH SCHOOL ASSOCIATION et al.,
Defendants and Respondents;
ASSOCIATION OF FAITH-BASED ORGANIZATIONS, Movant and
Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for
publication with the exception of parts IIIC., IIID., IIIE., IV and V.

## COUNSEL

Grace Hollis & Hanson, Kirk D. Hanson, Christopher J. Nelson and Michael J. Grace for Plaintiffs and Appellants.

Center for Law & Religious Freedom, Isaac Fong, Timothy J. Tracey; Alliance Defense Fund, Timothy D. Chandler; Law Offices of Stewart and Stewart and John Stewart for Movant and Appellant.

McKay, Graham & de Lorimier, John P. McKay and Michael P. Acain for Defendants and Respondents.

## OPINION

**RICHLI, J.**—Defendant California Lutheran High School Association (the School) owns and operates a private religious high school. It expelled plaintiffs Jane Doe and Mary Roe on the ground that they had a homosexual relationship, in violation of the School's "Christian Conduct" rule. Plaintiffs then sued the School and its principal, the Reverend Gregory R. Bork, alleging, among other things, that the School had discriminated against them based on sexual orientation, in violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.).

The trial court entered summary judgment in favor of defendants, ruling, in part, that the School was not a "business enterprise" and therefore not subject to the Unruh Civil Rights Act. Plaintiffs appeal. In the published portion of our decision, we will affirm this ruling. In the unpublished portion of our decision, we find no other error.[1] Hence, we will affirm the judgment.

### I

### FACTUAL BACKGROUND

#### A. *Preliminary Statement.*

Because this is an appeal from a summary judgment, we draw the following facts from the moving and opposition papers in connection with defendants' motion for summary judgment. We accept all facts listed in defendants' separate statement that plaintiffs did not dispute. We also accept all facts listed in defendants' separate statement that plaintiffs *did* dispute, to

---

[1] Also in the unpublished portion of our decision, we will dismiss, as moot, the appeal by the Association of Faith-Based Organizations from an order denying it leave to intervene.

the extent that (1) there is evidence to support them (Code Civ. Proc., § 437c, subd. (b)(1)), and (2) there is no evidence to support the dispute (Code Civ. Proc., § 437c, subd. (b)(3)). Finally, we accept all facts listed in plaintiffs' separate statement, to the extent that there is evidence to support them. (*Ibid.*) We disregard any evidence not called to the trial court's attention in the separate statement of one side or the other, except as necessary to provide nondispositive background, color, or continuity. (See *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 314–316 [125 Cal.Rptr.2d 499].)

Each side filed objections to some of the other side's proffered evidence. The trial court overruled all such objections. In this appeal, none of the parties has argued that this was error. We therefore deem any such contention forfeited. Accordingly, we may take into account any and all of the proffered evidence. (Code Civ. Proc., § 437c, subd. (c); see *Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014–1015 [120 Cal.Rptr.2d 281].)

B. *Facts Shown by the Evidence.*

The School is a nonprofit corporation. It owns and operates the California Lutheran High School, a private religious school in Wildomar. The School is affiliated with the Evangelical Lutheran Synod (ELS) and the Wisconsin Evangelical Lutheran Synod (WELS).

The School is accredited by the Western Association of Schools and Colleges, a secular accreditation authority. It offers a college preparatory curriculum designed to meet University of California entrance requirements. It offers classes in English, Spanish, Latin, history, government, economics, science, mathematics, business and technology, music, and physical education, along with classes in religion. Some of these classes are mandated by the state Education Code. It boasts that its graduates work "in the fields of business, computers, construction, education, engineering, health and medicine, law, law enforcement, military, ministry, and music."

The School requires students to pay tuition fees; for the 2005–2006 school year, it charged WELS-affiliated students $4,590 and other students $6,500. Failure to pay tuition may result in suspension.

The School allows members of the public to buy tickets to its football games and other sporting events. At football games, it sells food, beverages, T-shirts, and "spirit items." It sells advertising space in its yearbook to Lutherans and non-Lutherans alike. It holds fundraising auctions and golf tournaments that are open to the public. It has also rented portions of its campus, such as the gymnasium or the football field, to outside organizations for their events.

Lutherans[2] believe that homosexuality is a sin. The School has a policy of refusing admission to homosexual students. Its "Christian Conduct" rule provides that a student could be expelled for engaging in immoral or scandalous conduct, whether on or off campus. This would include homosexual conduct.

The School's enrollment application, which was supposed to be signed by both the student and a parent, provided: "In attaching their signatures to this application, both student and parent . . . acknowledge their understanding that admission to California Lutheran High School places the student under the policies and regulations of the school . . . and obliges both student and parent . . . to accept and to cooperate with those policies and regulations."[3]

In early September 2005, a student at the School reported to a teacher that one unnamed female student had said that she loved another unnamed female student. The reporting student added that, if the teacher looked at these female students' MySpace pages, he would be able to find out who they were and how they felt about each other.

The teacher then reviewed the MySpace pages of all female students on the class roster, including plaintiffs' MySpace pages. Mary Roe went by the screen name, "Scandalous love!" Jane Doe went by the screen name, "Truely [sic] in ♥ with You." On their MySpace pages, plaintiffs referred to being in love with each other. In addition, Mary Roe's MySpace page listed her sexual orientation as "bi."[4] Jane Doe's listed hers as "not sure."

As a result, on September 7, 2005, Pastor Gregory R. Bork, the principal of the School, called a meeting of the School's disciplinary committee. The committee agreed that Pastor Bork should talk to plaintiffs immediately and ask them if the report was true; if it was, they should be suspended.

That same day, Pastor Bork had plaintiffs taken out of class and brought to separate rooms in the school office. He then questioned each of them, asking them whether they were bisexual, whether they had kissed each other, and whether they had done anything "inappropriate." At one point, according to

---

[2] We use "Lutherans" as a shorthand way of referring to followers of either ELS or WELS, the only Lutheran synods whose beliefs are reflected in the record.

[3] Both Jane Doe and her mother signed her enrollment application. Mary Roe's father signed her enrollment application, but Mary Roe did not. Mary Roe's father denied ever reading the "Christian Conduct" rule. Mary Roe denied reading the rule but admitted knowing that it existed.

[4] Mary Roe admitted that the MySpace page was hers, but she claimed that a friend had created it for her and had falsely listed her as "bi" without her consent.

Mary Roe, "he got very close and he said, 'Have you ever touched [Jane Doe] in . . . any inappropriate ways?' And he looked me up and down when he asked that."

According to Pastor Bork, both girls admitted that they loved each other, that they had hugged and kissed each other, and that they had told other students that they were lesbians.[5] He therefore suspended them and had their parents come pick them up.

Throughout this time, plaintiffs were not free to leave. However, while they were waiting for their parents to pick them up, they were allowed to go to the restroom and to their lockers.

On September 12, 2005, Pastor Bork sent plaintiffs' parents letters stating that plaintiffs had been suspended because they had "a bond of intimacy . . . characteristic of a lesbian relationship," in violation of the "Christian Conduct" rule. On October 15, 2005, by a unanimous vote of the School's board of directors, the School expelled plaintiffs for engaging in a homosexual relationship.

Lutherans also believe that women should not be placed in a position of authority over men. Accordingly, only men serve on the School's board of directors, which is responsible for expulsions. Plaintiffs allege that, as a result, female students have been disciplined more harshly than male students. Their evidence showed that some male students had been involved in incidents of drug or alcohol possession or use that had resulted in, at most, temporary suspensions.

II

PROCEDURAL BACKGROUND

Plaintiffs' operative complaint asserted three causes of action solely against the School: Sexual orientation discrimination in violation of the Unruh Civil Rights Act; gender discrimination in violation of the Unruh Civil Rights Act; and unfair business practices (Bus. & Prof. Code, § 17200). In addition, it asserted three causes of action against both the School and Pastor Bork: public disclosure of private facts; violation of the California constitutional right to privacy; and false imprisonment.

---

[5] Plaintiffs deny admitting anything more than that they loved each other as friends. However, they do not claim that this factual dispute raised any triable issue of material fact. To the contrary, they claim that the School still discriminated against them based on their perceived sexual orientation.

Both sides filed cross-motions for summary adjudication. Plaintiffs sought summary adjudication on their first cause of action, for sexual orientation discrimination. Defendants sought summary judgment on all causes of action. The trial court granted defendants' motion, while denying plaintiffs' motion as moot. It ruled, in part, that the School was not a business within the meaning of the Unruh Civil Rights Act. Accordingly, it entered judgment in favor of defendants.

## III

## THE SUMMARY JUDGMENT

Plaintiffs challenge the propriety of the summary judgment with respect to each of their causes of action. Accordingly, we begin by discussing the applicable standard of review, which we will then apply to plaintiffs' causes of action in succession.

### A. *Standard of Review.*

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) "[I]n moving for summary judgment, a 'defendant . . . has met' his 'burden . . . if' he 'has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. . . .' [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "We review the trial court's decision de novo . . . . [Citations.]" (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65–66 [99 Cal.Rptr.2d 316, 5 P.3d 874].)

### B. *Causes of Action for Violation of the Unruh Civil Rights Act.*

First, plaintiffs challenge the summary judgment with respect to their causes of action under the Unruh Civil Rights Act. They contend that the trial court erred by ruling that the School was not a "business enterprise" subject to the act.

Preliminarily, plaintiffs argue that the trial court's ruling conflicts with previous rulings in the case. Early on, defendants demurred on multiple grounds, including that the School was not a business enterprise under the Unruh Civil Rights Act; the trial court overruled the demurrer on this ground.

Moreover, when defendants sought writ review of that ruling, this court summarily denied their petition. However, because the demurrer concerned the pleadings, whereas the motion for summary judgment concerned the evidence, the two rulings were not inconsistent. (*Leo F. Piazza Paving Co. v. Foundation Constructors, Inc.* (1981) 128 Cal.App.3d 583, 591, fn. 4 [177 Cal.Rptr. 268].) Moreover, even assuming they were, the statutory limitations on reconsideration (Code Civ. Proc., § 1008) did not apply; hence, the trial court had plenary authority to change its mind. (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1096, 1100 [29 Cal.Rptr.3d 249, 112 P.3d 636].) Finally, our order denying a writ did not establish the law of the case. (*Kowis v. Howard* (1992) 3 Cal.4th 888, 891 [12 Cal.Rptr.2d 728, 838 P.2d 250].) Accordingly, we turn to the merits.

Following the lead of our Supreme Court in similar cases, "[w]e emphasize at the outset that our resolution of the legal issue before us does not turn upon our personal views as to the wisdom or morality of the exclusionary . . . policy challenged in this case. Instead, our task involves a question of statutory interpretation." (*Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 598 [42 Cal.Rptr.2d 50, 896 P.2d 776].)

"The general policy embodied in [Civil Code] section 51 can be traced to the early common law doctrine that required a few, particularly vital, public enterprises—such as privately owned toll bridges, ferryboats, and inns—to serve all members of the public without arbitrary discrimination. [Citation.] After the United States Supreme Court, in the *Civil Rights Cases* (1883) 109 U.S. 3 [27 L.Ed. 835, 3 S.Ct. 18], invalidated the first federal public accommodation statute, California joined a number of other states in enacting its own initial public accommodation statute, the statutory predecessor of the current version of section 51. [Citation.] . . . [T]he 1897 statute, by its terms, specifically granted the right to 'full and equal accommodations, advantages, facilities and privileges' in a number of specifically designated enterprises, as well as in 'all other places of public accommodation or amusement.'

"In 1959, in apparent response to a number of appellate court decisions that had concluded the then-existing public accommodation statute did not apply to the refusal of a private cemetery, a dentist's office, and a private school to make their facilities available to African-American patrons [citations], the Legislature undertook, through enactment of the Unruh Civil Rights Act, to revise and expand the scope of the then-existing version of section 51. . . . As ultimately enacted in 1959, the relevant paragraph of section 51 provided: 'All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in *all business establishments of every kind*

*whatsoever.*' [Citation.] In subsequent years, this paragraph of section 51 was amended to add 'sex' and 'disability' to the specified categories of prohibited discrimination [citations], but the paragraph otherwise has not been altered." (*Warfield v. Peninsula Golf & Country Club, supra*, 10 Cal.4th at pp. 607–609.)

"An organization is not excluded from the scope of Civil Code section 51 simply because it is nonprofit. [Citation.]" (*Hart v. Cult Awareness Network* (1993) 13 Cal.App.4th 777, 786 [16 Cal.Rptr.2d 705].) Thus, cases have held that "business establishments" included (1) a nonprofit religious corporation that sold advertisements in a "Christian Yellow Pages" (*Pines v. Tomson* (1984) 160 Cal.App.3d 370, 383–386 [206 Cal.Rptr. 866]); (2) a homeowners association that "perform[ed] all the customary business functions" of a landlord (*O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 795–796 [191 Cal.Rptr. 320, 662 P.2d 427]); (3) a club that offered its members substantial "commercial advantages and business benefits" (*Rotary Club of Duarte v. Board of Directors* (1986) 178 Cal.App.3d 1035, 1056 [224 Cal.Rptr. 213]; see *id.* at pp. 1055–1058); and (4) a club that operated a recreation center open to all local male children (*Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 78–84 [219 Cal.Rptr. 150, 707 P.2d 212]).

Two cases decided by the California Supreme Court afford particularly apt illustrations of what is—and what is not—a business establishment within the meaning of the Unruh Civil Rights Act. First, in *Warfield v. Peninsula Golf & Country Club, supra*, 10 Cal.4th 594, the court held that a member-owned nonprofit golf and country club was a business establishment. It conceded "that, at least as a general matter, the statute does not apply to truly private social clubs." (*Id.* at p. 617.) It concluded, however, that "*the business transactions that are conducted regularly on the club's premises with persons who are not members of the club* are sufficient in themselves to bring the club within the reach of [the Act]." (*Id.* at p. 621.)

The court explained: "[A]lthough the record indicates that defendant's financial support comes primarily from dues and fees paid by its members, the club derives a significant amount of revenue, as well as indirect financial benefit, from the use of its facilities, and the purchase of goods and services on its premises, by persons who are *not* members of the club. Because such 'business transactions' with nonmembers are conducted on a regular and repeated basis and constitute an integral part of the club's operations—supplementing the members' own financial contributions and reducing the dues and fees that members otherwise would be required to pay in order to maintain the club's facilities and operations—we conclude that the club falls within the very broad category of 'business establishments' governed by the

nondiscrimination mandate of section 51." (*Warfield v. Peninsula Golf & Country Club, supra,* 10 Cal.4th at p. 599.)

■ By contrast, in *Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670 [72 Cal.Rptr.2d 410, 952 P.2d 218], the court held that, "with regard to its membership decisions, [the Boy Scouts of America] is not a business establishment within the meaning of the Unruh Civil Rights Act." (*Id.* at p. 696; see also *id.* at p. 696, fn. 15.) It acknowledged that "the term 'business establishments' must properly be interpreted 'in the broadest sense reasonably possible' [citation] . . . ." (*Id.* at p. 696.) "Nonetheless, . . . no prior decision has interpreted the 'business establishments' language of the Act so expansively as to include the membership decisions of a charitable, expressive, and social organization, like the Boy Scouts, whose formation and activities are unrelated to the promotion or advancement of the economic or business interests of its members. [Citation.]" (*Id.* at p. 697.)

The court went on to explain: "[I]n light of the legislative history demonstrating that the Unruh Civil Rights Act was intended *to extend* the reach of California's prior public accommodation statute, the very broad 'business establishments' language of the Act reasonably must be interpreted to apply to the membership policies of an entity—even a charitable organization that lacks a significant business-related purpose—if the entity's attributes and activities demonstrate that it is the functional equivalent of a classic 'place of public accommodation or amusement.' [Citation.]

". . . [H]owever, we do not believe that the circumstance that the Boy Scouts is generally nonselective in its admission policies, and affords membership to a large segment of the public, is itself sufficient to demonstrate that the organization reasonably can be characterized as the functional equivalent of a traditional place of public accommodation or amusement. The record establishes that the Boy Scouts is an organization whose primary function is the inculcation of a specific set of values in its youth members, and whose recreational facilities and activities are complementary to the organization's primary purpose. . . . [M]embership in the Boy Scouts is not simply a ticket of admission to a recreational facility that is open to a large segment of the public and has all the attributes of a place of public amusement. Scouts meet regularly in small groups (often in private homes) that are intended to foster close friendship, trust and loyalty, and scouts are required to participate in a variety of activities, ceremonies, and rituals that are designed to teach the moral principles to which the organization subscribes." (*Curran v. Mount Diablo Council of the Boy Scouts, supra,* 17 Cal.4th at pp. 697–698.)

The plaintiff argued, by analogy to *Warfield,* that "the extensive business activities that the Boy Scouts regularly conducts with nonmembers—in its

retail shops or stores, and through the licensing of the use of its insignia—properly should render the organization a business establishment . . . ." (*Curran v. Mount Diablo Council of the Boy Scouts, supra,* 17 Cal.4th at p. 699.) The Supreme Court rejected this argument. It explained: "[T]he Boy Scouts is an expressive social organization whose primary function is the inculcation of values in its youth members, and whose small social group structure and activities are not comparable to those of a traditional place of public accommodation or amusement. . . . [T]he business transactions with nonmembers engaged in by the Boy Scouts do *not* involve the sale of access to the basic activities or services offered by the organization. Nonmembers cannot purchase entry to pack or troop meetings, overnight hikes, the national jamboree, or any portion of the Boy Scouts' extended training and educational process. Although we have no doubt that the Unruh Civil Rights Act would apply to, and would prohibit discrimination in, the actual business transactions with nonmembers engaged in by the Boy Scouts in its retail stores and elsewhere . . . [,] we conclude that such transactions do not render the Boy Scouts a business establishment so as to bring its membership policies or decisions within the reach of the Unruh Civil Rights Act. Those business transactions are distinct from the Scouts' core functions and do not demonstrate that the organization has become a commercial purveyor of the primary incidents and benefits of membership in the organization." (*Id.* at pp. 699–700.)

■ *Curran* is controlling here. Just like the Boy Scouts, the School "is an expressive social organization whose primary function is the inculcation of values in its youth members." (*Curran v. Mount Diablo Council of the Boy Scouts, supra,* 17 Cal.4th at p. 699.) According to its mission statement, as set forth in its student handbook, "CLHS exists to glorify God by using his inerrant Word to nurture discipleship in Christ, serving primarily the youth of our WELS and ELS congregations, equipping them for a lifetime of service to their Savior, their homes, churches, vocations and communities."

Moreover, admission to the School, unlike membership in the Boy Scouts, is effectively selective and based on these values. As the Supreme Court noted, "the Boy Scouts is generally nonselective in its admission policies, and affords membership to a large segment of the public . . . ." (*Curran v. Mount Diablo Council of the Boy Scouts, supra,* 17 Cal.4th at p. 697.) It espouses values, such as being " 'trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent' " (*id.* at p. 681, fn. 6), that appeal to a broad range of people. By contrast, the School espouses specifically Lutheran values; it offers admission to Lutheran families and to other "families . . . who are in harmony with the policies and principles of our school."

Although the fact that the School is nonprofit is not controlling, this does mean that it should not be deemed a business unless it has some significant resemblance to an ordinary for-profit business. In our society, however, private elementary and secondary schools are overwhelmingly not-for-profit enterprises. Even such prestigious and well-endowed private schools as Groton School and Phillips Exeter Academy are charitable organizations. (<http://www.guidestar.org/pqShowGsReport.do?partner=seo&ein=04-2104265> and <http://www.guidestar.org/pqShowGsReport.do?partner=seo&ein=02-0222174> [as of Jan. 26, 2009].) And public schools, of course, are run on a nonprofit basis by the government.

■ The California Attorney General has opined that, under *Curran*, the admission decisions of a private religious school are not subject to the Unruh Civil Rights Act. (81 Ops.Cal.Atty.Gen. 189 (1998).) His opinion states: "[A] private nonprofit religious school has as its 'overall purpose and function' the education of children in keeping with its religious beliefs. The 'inculcation of a specific set of values,' with programs 'designed to teach the moral principles to which the [school] subscribes,' prevents such a school from being considered a 'business establishment' whose student admission practices would be subject to the Act." (*Id.* at p. 195, fn. omitted.) We agree.

Plaintiffs argue that the School, like the country club in *Warfield*, engages in business transactions with the general public. They note that it sells tickets to football games and other sporting events; at these sporting events, it sells concessions, T-shirts, and "spirit items"; it holds fundraising auctions and golf tournaments; and it sells advertising space in yearbooks. Nevertheless, unlike the nonmember transactions in *Warfield*—but like the nonmember transactions in *Curran*—these transactions "do not involve the sale of access to the basic activities or services offered by the organization." (*Curran v. Mount Diablo Council of the Boy Scouts, supra*, 17 Cal.4th at p. 700, italics omitted.)

Moreover, as the trial court aptly noted, "[T]he complaint of Mary Roe and Jane Doe isn't that they were excluded from purchasing a sweatshirt or going to a football game, but their dismissal from the school goes to the very heart of the reason for the[] existence of the school . . . ." In *Curran*, the court recognized that the Boy Scouts could be a business, and hence be prohibited from discriminating, with respect to its nonmember transactions, yet *not* be a business, and hence *not* be prohibited from discriminating, with respect to its membership decisions. (*Curran v. Mount Diablo Council of the Boy Scouts, supra*, 17 Cal.4th at p. 700.) The same is true of the School.

■ Plaintiffs argue that the School is a business because it charges students for its educational services. However, both *Warfield* and *Curran*

focused on business transactions with *nonmembers*. It seems implicit in both opinions that an otherwise private organization can engage in some business transactions with *members* without the risk of becoming a "business enterprise" for purposes of the Unruh Civil Rights Act. After all, even a private organization must have some source of funding for "the basic activities or services" that it offers. As long as this funding comes from members, it should not matter whether it is called a tithe, dues, fees, tuition, or something else.

In this connection, plaintiffs invoke *Pines v. Tomson, supra*, 160 Cal.App.3d 370, which held that a nonprofit religious corporation (Christian Yellow Pages (CYP)) that published a "Christian Yellow Pages" was a business subject to the Unruh Civil Rights Act. (*Pines*, at pp. 383–386.) There, however, the only counterargument CYP seems to have raised was that it was "nonprofit" and "noncommercial." (*Id.* at p. 386.) Thus, the court merely held that these attributes did not *preclude* CYP from being found to be a business for purposes of the Unruh Civil Rights Act. Moreover, the court relied on the opinion in *Curran v. Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712 [195 Cal.Rptr. 325] (*Pines*, at pp. 385–386), which had held (in the context of a demurrer) that the Boy Scouts *was* a business. As we now know, this is not the law.

■ Plaintiffs claim that the business status of CYP in *Pines* was demonstrated by, "among other things," the fact that the CYP sold advertising in exchange for money. What the court in *Pines* actually said, however, was that "[w]hile the CYP certainly had 'businesslike attributes,' . . . the CYP 'fits both the commercial and noncommercial aspects of the meaning of "business establishment." ' [Citation.]" (*Pines v. Tomson, supra*, 160 Cal.App.3d at p. 386, quoting *Curran v. Mount Diablo Council of the Boy Scouts, supra*, 147 Cal.App.3d at p. 730.) From the court's use of the word "[w]hile," it appears to have meant it was not relying on these "business attributes" in holding that the CYP was a business establishment. Moreover, in a footnote, it listed the "business attributes" that the plaintiffs in *Pines* had cited, including not only that the CYP sold advertising space for money, but also that it was modeled on the telephone companies' Yellow Pages, it had originally been a "proprietary" operation of its founder, and its founder had "admi[tted]" that it had a " 'commercial and economic purpose.' " (*Pines*, at p. 386, fn. 10.) Thus, even under plaintiffs' reading of *Pines*, it does not appear that merely selling a service to like-minded persons for money is enough to make a nonprofit organization a "business establishment."

Plaintiffs argue that the School teaches not only religious subjects, but also such garden-variety secular subjects as English, history, mathematics, and physical education. Nevertheless, the School's religious message is inextricably intertwined with its secular functions. The whole purpose of sending

one's child to a religious school is to ensure that he or she learns even secular subjects within a religious framework; otherwise, merely supplementing the child's secular education with Sunday school or a religion class would suffice.[6]

Finally, plaintiffs cite the School's "complex structure," "large staff," "large income and budget," and "extensive physical facility." The Boy Scouts of America, however, has, if anything, a more complex structure, a larger staff, a bigger budget, and a more extensive physical facility, yet these factors evidently did not make it a business.

We emphasize the narrow scope of our holding. We hold only that the School established, beyond a triable issue of fact, that it is not a business establishment within the meaning of the Unruh Civil Rights Act. The School has also argued that the Unruh Civil Rights Act, if construed to prohibit it from discriminating based on sex or sexual orientation, would violate the right to freedom of expressive association, as well as the right to control the education of one's child.[7] We need not and we do not address these issues.

We therefore conclude that the trial court properly granted summary judgment on plaintiffs' Unruh Civil Rights Act causes of action.

C.–E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV, V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[6] Plaintiffs assert that "[t]he Education Code *requires* that [the School]'s main purpose be education . . . ." (Boldface omitted.) However, the Education Code sections that they cite simply make elementary and secondary education compulsory (Ed. Code, §§ 37630, 48200, 48222) and require a private school to "offer instruction in the several branches of study required to be taught in the public schools of the state." (Ed. Code, § 48222; see also *id.*, § 51220.) Thus, while a private school must provide an education in secular subjects, plaintiffs have not shown that this must be its main purpose.

[7] The School does not invoke the right to freedom of religion, apparently recognizing that *North Coast Women's Care Medical Group, Inc. v. Superior Court* (2008) 44 Cal.4th 1145 [81 Cal.Rptr.3d 708, 189 P.3d 959] would be adverse authority on that point.

*See footnote, *ante,* page 828.

## VI

## DISPOSITION

In plaintiffs' appeal, the judgment is affirmed. Defendants are awarded costs of that appeal against plaintiffs.

The Association's appeal is dismissed as moot. In the interests of justice, all parties shall bear their own costs of that appeal.

Ramirez, P. J., and Miller, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied April 29, 2009, S171078. Werdegar, J., was of the opinion that the petition should be granted.